# Exhibit A

# DBR FRANCHISING, LLC

# FRANCHISE AGREEMENT

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

DBRFA-0309

TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I. | GRANT, EXCLUSIVE AREA, TERM AND INITIAL FEE | 3 |
| II. | CONTINUING ROYALTY-SERVICE FEES | 6 |
| III. | ADVERTISING-PROMOTION | 9 |
| IV. | OBLIGATIONS OF FRANCHISOR | 11 |
| V. | OBLIGATIONS OF FRANCHISEE | 14 |
| VI. | PROPRIETARY MARKS | 20 |
| VII. | HOUSEMASTER METHOD AND MARKETING STRATEGY | 22 |
| VIII. | RIGHTS AND LIMITATIONS ON ASSIGNABILITY BY FRANCHISEE | 23 |
| IX. | ASSIGNABILITY BY FRANCHISOR | 27 |
| X. | TERMINATION | 28 |
| XI. | OBLIGATIONS UPON TERMINATION | 30 |
| XII. | COVENANTS NOT TO COMPETE | 32 |
| XIII. | DISPUTE RESOLUTION | 35 |
| XIV. | MISCELLANEOUS | 38 |
| XV. | ACKNOWLEDGMENTS BY FRANCHISEE | 39 |

EXHIBITS:

A. CONDITIONAL ASSIGNMENT OF FRANCHISEES TELEPHONE NUMBERS

B. CONSENT AGREEMENT FOR CREDIT CARD AUTHORIZATION

C. ELECTRONIC FUNDS TRANSFER AUTHORIZATION FORM

D. ADDENDUM TO THE FRANCHISE AGREEMENT FOR LIMITED AREA FRANCHISE

E. ADDENDUM TO THE FRANCHISE AGREEMENT FOR THE STATE OF NEW YORK

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

# DBR FRANCHISING, LLC
## FRANCHISE AGREEMENT

This Agreement is made at 426 Vosseller Avenue, Bound Brook, NJ 08805, as of September 1, 2009, by and between DBR Franchising, LLC, a Delaware limited liability company, having its principal place of business at 426 Vosseller Ave,, Bound Brook, New Jersey 08805 (hereinafter referred to as "Franchisor") and William Basch, (hereinafter referred to as "Franchisee"), having its principal place of business at 3 Walton Street, Brooklyn, NY 11206

## RECITALS

Franchisor has developed and acquired a comprehensive business method known as the "HouseMaster" Method of operating a building inspection and related services business ("the HOUSEMASTER Business"). The HOUSEMASTER Method, consisting, in part, of confidential and proprietary business systems, techniques, and formats was developed through considerable expenditures of effort and money, and is identified by and with certain proprietary names and marks owned by Franchisor ("the HOUSEMASTER Method"). Further, Franchisor has developed through considerable expenditures of effort and money proprietary strategies for marketing and promoting a building inspection and related services business ("the Marketing Strategy").

Franchisor is in the business of franchising to others, who desire to engage in the HOUSEMASTER Business, the right to use the HOUSEMASTER Method, Marketing Strategy, and Franchisor's proprietary names, marks, software and forms associated with it, as currently developed and as improved in the future. In order to assist franchisees to use the HOUSEMASTER Method and Marketing Strategy efficiently and effectively in the operation and promotion of the HOUSEMASTER Business, and to provide high quality and uniform standards of service, Franchisor provides or makes available to franchisees various initial and continuing training and services.

Franchisee desires to use the HOUSEMASTER Method and Marketing Strategy in the operation and development of a building inspection and related services business under a franchise granted by Franchisor, and in conformance with the terms of this Agreement, from a location within a geographic area hereinafter described ("the Franchised Business"). Franchisee also desires to obtain and to derive the benefits of Franchisor's initial and continuing services, training, guidance, expertise, know-how, and information for its use in operating and managing the Franchised Business.

Franchisee acknowledges as essential conditions of this Agreement and the rights granted hereunder, and as consideration exchanged by and for the mutual benefit of all franchised users of the HOUSEMASTER Method, Marketing Strategy and names, that Franchisee adhere to the uniform standards of quality, procedure and format prescribed by the HOUSEMASTER Method and Marketing Strategy; preserve the confidentiality of the HOUSEMASTER Method and Marketing Strategy; and comply fully with the obligations hereinafter set forth.

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

Franchisor grants franchises within a reciprocal opportunity franchise territory within which more than one HOUSEMASTER franchisee will be granted the right to operate a Business; and in certain limited circumstances, Franchisor will grant a franchise for a Limited Area within which the franchisee will operate the HOUSEMASTER Business and in which no other HOUSEMASTER franchisee will be granted the right to operate ("Limited Area Franchise").   If a Limited Area Franchise is granted, Franchisee must execute a separate Addendum to Franchise Agreement for a Limited Area Franchise in addition to this Agreement.

In consideration of the foregoing recitals, of the mutual promises hereinafter set forth, and of other good and valuable consideration, Franchisor and Franchisee hereby agree as follows:

## I.   GRANT, EXCLUSIVE AREA, TERM AND INITIAL FEE

**A.   Grant of Franchise.**   Franchisor hereby grants to Franchisee, and Franchisee here by accepts from Franchisor, an exclusive area, right and franchise for the terms and upon the conditions and terms hereinafter set forth:

1.   To use the HOUSEMASTER Method, Marketing Strategy, and Proprietary Marks as defined in Section VI.A. below in connection with the operation of the Franchised Business at a location within the following territory See Exhibit 'D' ("Reciprocal Opportunity Franchise Territory" or "ROF Territory").   Within this ROF Territory the Franchisee is granted the following geographic area designated by zip/postal codes: See Exhibit 'D' ("Designated Geographic Area").   Should the boundaries of any such postal codes change for any reason, Franchisee's Designated Geographic Area will be deemed to be the same geographic boundaries as those designated for those postal codes on the effective date of this Agreement.   The Franchisee must establish a location for the Franchised Business ("Franchise Location") within the Designated Geographic Area, subject to approval by Franchisor. Franchisor shall not grant approval to another HOUSEMASTER franchisee to locate an office or itself or through an affiliate establish a HOUSEMASTER office within Franchisee's Designated Geographic Area.   Franchisor reserves the right to establish other franchises using the HOUSEMASTER Method, Marketing Strategy and Proprietary Marks in the Reciprocal Opportunity Franchise Territory granted to Franchisee during the term and any successor term of this Agreement.

2.   To use confidential information, trade secrets, operating manuals, software systems, Marketing Strategy, bulletins, forms and other business methods and know-how disclosed by Franchisor (along with the HOUSEMASTER Manuals, HOUSEMASTER Method, and Marketing Strategy, collectively referred to as the "Confidential Information"), solely in connection with the operation of the Franchised Business conducted in the ROF Territory and in accordance with the terms of this Agreement and in conformity with any requirements contained in the HOUSEMASTER Manuals as defined in Section VII.C. below or otherwise in writing.

3.   To use Franchisor's proprietary names, marks, copyrighted works and methods franchised hereunder only in the manner prescribed by this Agreement and in

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

conformity with any requirements contained in the Manuals or otherwise in writing for so long as this Agreement shall remain in effect and Franchisee is in compliance with its terms.

4.      Franchisee may promote his/her Franchised Business and/or solicit customers anywhere within the Reciprocal Opportunity Franchise Territory. Nothwithstanding the foregoing, Franchisee shall not conduct office sales visits for any Real Estate Service Provider nor display any sales materials ("In-Office Marketing") in a location outside their Designated Geographic Area. Franchisees may, however, conduct In-Office Marketing in the physical office of the board of realtors and Chambers of Commerce even where such offices are located outside of the Designated Geographic Area as such offices shall be accessible to all franchisees within the Reciprocal Opportunity Franchise Territory. A "Real Estate Service Provider" shall include realtors, real estate lawyers, lenders and credit unions. In no event shall Franchisee conduct inspections, compete for business, advertise or promote the HOUSEMASTER franchise or solicit customers outside the Reciprocal Opportunity Franchise Territory. If the adjacent area is unlicensed and deemed "open" (as defined herein below), Franchisee may conduct inspections only (but may not conduct marketing) in accordance with the rules prescribed by Franchisor for open areas. Franchisee shall not conduct an inspection in another Reciprocal Opportunity Franchise Territory other than the one licensed to Franchisee. Nor may Franchisee conduct inspections in another HOUSEMASTER franchisee's Limited Area. Conducting an inspection in another Reciprocal Opportunity Franchise Territory or in a Limited Area, or engaging in any marketing, advertising or solicitation of customers prohibited by this Agreement will result in a fine of $1,000 per occurrence payable to Franchisor, due upon demand. This penalty is in addition to, not in lieu of, Franchisor's right to terminate Franchisee for said conduct.

If Franchisee conducts an inspection in a geographic area that has not been designated by Franchisor as a ROF Territory and which has not been licensed to another franchisee as a Limited Area ("open area"), no consent is required and no penalty will be assessed against Franchisee.   However, if such a geographic area is later granted to a HOUSEMASTER franchisee (whether a Reciprocal Opportunity Franchise Territory or a Limited Area), the cross-territory fine would be enforceable from the date of the grant of the franchise forward. Under no circumstances may Franchisee engage in marketing activities in an open area. Further, if Franchisor receives a complaint regarding a franchisee crossing territories, and encroaching upon the Reciprocal Opportunity Franchise Territory or Limited Area of another franchisee(s), any confidentiality that may attach to records, reports or forms pursuant to Section II.B.(6.) contained herein is deemed waived by Franchisee.

5.      In consideration of Franchisor's agreement to grant the franchise, Franchisee at all times shall use its best efforts to promote and increase the sales and service of the HOUSEMASTER Method and system overall and to effect the widest and best possible distribution and sale of HOUSEMASTER services within the ROF Territory.

**B.    Term; Commencement of Operations**. The term of this Agreement and of the right and franchise granted herein shall be for a period of five (5) years commencing on September 1, 2009, and ending on August 31, 2014, unless sooner terminated in accordance with the terms of this Agreement. Franchisee hereby agrees to commence operations hereunder no

later than September 1, 2009 ("Business Effective Date").  For purposes of this Agreement, Franchisee's fiscal year shall begin on the first day of January and end on the last day of December for so long as this Agreement remains in effect.

    **C.**    **Successive Term.**  Franchisee shall have the option to extend the initial franchise grant by executing a successor franchise agreement for a successive term provided all of the following conditions have been fulfilled:

    1.    Franchisee gives written notice to Franchisor of Franchisee's intention to enter into a successor franchise agreement no later than one hundred eighty (180) days prior to the expiration of the term of this Agreement and this Agreement has not otherwise been terminated;

    2.    Franchisee has fully and satisfactorily fulfilled and complied with all of the terms, conditions and obligations of this Agreement, including but not limited to all obligations of Franchisee as provided in Section V herein, and with all mandatory specifications, standards or operating procedures which Franchisor may prescribe from time to time, regardless of whether any non-compliance has been cured by Franchisee;

    3.    Franchisee executes no later than one hundred twenty (120) days prior to the expiration of the term of this Agreement a successor franchise agreement containing the terms and conditions then being accepted by new franchisees, which may include changes in duties and obligations, and royalty-service fees, advertising-promotion contributions, and other fees which are higher than those in this Agreement; except that no initial franchise fee shall be payable by Franchisee upon the execution of the successor franchise agreement;  Franchisee shall be deemed to have irrevocably declined to execute a successor franchise agreement if Franchisee fails to execute and return to Franchisor the successor franchise agreement and other documents or fails to satisfy any other conditions required by Franchisor prior to the end of the then-expiring term;

*AS PER E-MAIL FROM Ricit*

*WR*  *$0*
    4.    Pay a fee in the amount of Two Thousand Five Hundred Dollars (~~$ 2,500.00~~) in connection with the execution of a Successor Franchise Agreement.

*WR*
*2/2/10*
    5.    As a condition of renewal, Franchisee or Franchisee's manager may be required to attend Marketing/Operations and/or NIBI training again and/or observe "centers of excellence" as determined by Franchisor in its sole discretion;

    6.    Franchisee has satisfactorily participated in Franchisor's marketing programs, and has represented the brand in a professional and courteous manner;

    7.    Franchisee and such other management person, if any, as described in Section V.B. of this Agreement are in reasonably satisfactory condition of health; and

    8.    Franchisee and its owners execute a general release, in a form acceptable to Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, employees and agents.

**D.     Initial Franchise Fee.** In consideration of the right, and franchise granted by this Agreement, Franchisee shall pay to Franchisor prior to or concurrently with Franchisee's execution of this Agreement the sum of <u>See Exhibit 'D'</u> as an initial franchise fee (the "Initial Franchise Fee"). The Initial Franchise Fee shall be deemed fully earned by Franchisor upon Franchisor's execution of this Agreement, and, except as provided in Section IV.A.3. of this Agreement and the Refund and Release Addendum to the Franchise Agreement, if applicable, such Initial Franchise Fee shall not be refundable, in whole or part, at any time or under any circumstances. The Initial Franchise Fee is in addition to the periodic royalty-service fee payable pursuant to Section II. and any promotional-advertising service fee payable pursuant to Section III. of this Agreement and to any other fees or payments which Franchisee may incur or owe to Franchisor from time to time under this Agreement or any other agreements. This Initial Franchise Fee is not applicable to successor franchise agreements.

**E.     Franchisor's Reservation of Rights.** Franchisor (on behalf of itself, its affiliates and any successors and assigns) reserves the right, both within and outside the ROF Territory, to operate a company-owned business or to grant a franchise to sell services and products the same as or similar to those that are sold under the HOUSEMASTER Method under different service marks and trademarks (i.e., non-HOUSEMASTER franchises).

## II.     CONTINUING ROYALTY SERVICE FEES

**A.     Amount and Payment of Periodic Fees.**

1.     In further consideration of the rights and entitlements granted under this Agreement, Franchisee agrees to pay to Franchisor on or before the 10th day of the month for the preceding calendar month throughout the term of this Agreement, a combined royalty-service fee in the dollar amount calculated as a percentage of Franchisee's Gross Sales for the previous month as shown below:

| Total Year-to-Date Gross Sales (defined below) Made by Franchisee <u>During current calendar year</u> | | Monthly royalty-service fee payable (as a percentage of <u>previous month's Gross Sales)</u> |
|---|---|---|
| $0 - $125,000 | ... | 7½% of month's Gross Sales |
| $125,001 - $250,000 | ... | 7% of month's Gross Sales |
| $250,001 - $500,000 | ... | 6½% of month's Gross Sales |
| $500,001 - $1,000,000 | ... | 6% of month's Gross Sales |
| $1,000,001 - $1,500,000 | ... | 5½% of month's Gross Sales |
| $1,500,001 and over | ... | 5% of month's Gross Sales |

For example purposes only and not as any indication of Gross Sales levels Franchisee should expect to achieve, should Franchisee generate Gross Sales of $350,000 during a calendar year, the monthly royalty-service fee payable by Franchisee during that year shall equal:

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

- 7½% of the previous month's Gross Sales on the first $125,000 in Gross Sales;
- 7% of the previous month's Gross Sales on the next $125,000 in Gross Sales; and
- 6½ % of the previous month's Gross Sales on the final $100,000 in Gross Sales.

Should Franchisee cross one of the Gross Sales thresholds defined above during a calendar month, the monthly royalty-service fee payable by Franchisee for that month shall equal the sum of the amount of Gross Sales left in the first applicable threshold multiplied by the applicable percentage PLUS the amount of Gross Sales in the next applicable threshold multiplied by the applicable percentage. In other words, Franchisee MUST pay the applicable royalty-service fee percentage on the full amount of each Gross Sales threshold before Franchisee can use the reduced royalty-service fee percentage in the next applicable threshold.

For example purposes only and not an any indication of Gross Sales levels Franchisee should expect to achieve, should Franchisee have year-to-date Gross Sales through May 31st of $100,000 and Franchisee generates $50,000 in Gross Sales for the month of June which brings Franchisee's year-to-date Gross Sales to $150,000, the monthly royalty-service fee payable by Franchisee for the month of June shall equal the sum of $25,000 times 7½% plus $25,000 times 7%, or a total of $3,625.

"Gross Sales" means the total dollar volume of inspections and related services conducted in connection with the Franchised Business as described herein whether said business is in Franchisee's licensed ROF Territory or otherwise (including, but not limited to wood destroying insect testing and/or treatment, water testing, radon gas testing and/or mitigation, mold testing, septic tank evaluations and/or cleaning, lead paint testing, buried tank testing, preventative maintenance inspections, safety inspections and inspection-related fee paid speaking or training engagements) booked by the Franchised Business each year and all fees and commissions received by Franchisee from third parties as a result of Franchisee's referrals of customer names and/or business to the third parties. There shall be excluded from Gross Sales taxes added to the sales price and collected from the customer and bona fide refunds, rebates, and discounts. Continuing for so long as this Agreement is in effect, Franchisee agrees to pay to Franchisor as a minimum monthly royalty-service fee in the sum of See Exhibit 'D' beginning on the Business Effective Date. Royalty-service fee payments received by Franchisor under this Agreement shall be under no restriction whatsoever, but shall be considered general funds of Franchisor for any and all purposes.

2.    Franchisee shall submit to Franchisor, at the time each monthly payment of the royalty-service fee and advertising-promotion contribution are due, a true, accurate and complete statement of Gross Sales (as heretofore defined) in a format specified, approved or provided by Franchisor and completed according to their terms. In the event Franchisor does not receive Franchisee's royalty-service fee, advertising-promotion contribution and the report by the 10th day of the month following the close of the month for which such fees and report are due and payable, then such payments shall be deemed delinquent. For all delinquent payments, Franchisee shall pay Franchisor 7½% of Gross Sales for the royalty-service fee and 2½% of

DBR.FA 0309

HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● **HouseMaster** ● HouseMaster ● HouseMaster ● HouseMaster

Gross Sales for the advertising-promotion contribution regardless of Franchisee's level of annual Gross Sales for the period or periods payments are delinquent, and Franchisor shall have the right in its discretion to charge either a late payment fee not to exceed Ten Dollars ($10.00) per day for each day the payments remain delinquent, or interest at a rate of eight percent (8%) per annum.  To the extent Franchisee fails to submit reports when due, Franchisor may calculate amounts due based on Franchisee's average monthly Gross Sales as determined by Franchisor for the preceding eighteen (18) months as provided in Section XIII.B.3. herein.  The provisions in this paragraph shall not constitute a waiver by Franchisor of any other remedies available to it for Franchisee's failure to make timely payments.

        3.     Franchisee is required to make the monthly payments for the royalty-service fee and advertising-promotion contribution and any and all other fees that may become due and payable to us hereunder by either electronic transfer or by electronic debiting of Franchisee's business account.  Franchisee shall execute the Electronic Funds Transfer Authorization Form attached as Exhibit C to this Agreement as soon as Franchisee has established a bank account for the Franchised Business and shall execute any other documents as may be required from time to time by Franchisor to permit Franchisor to electronically transfer funds or debit Franchisee's account for the purpose of making the required payments.

        4.     In addition to collecting any fees from electronic transfer or by electronic debiting, Franchisee authorizes Franchisor to charge ANY AND ALL fees due, including, but not limited to, royalty-service fees, advertising-promotion contributions, Conference Registration Fee (as such term is defined at Section V.B.9. herein), supply invoices, insurance premiums, claims deductibles, and late penalties and interest to any credit card previously submitted and retained on file by Franchisor.  Franchisee shall execute the Consent Agreement for Credit Card Authorization attached hereto as Exhibit B or any other similar form necessary for Franchisor to make such charges.  Franchisee is responsible for updating such information as necessary (e.g. expiration dates, preferred credit card), and at Franchisor's request from time to time.

**B.**    **Reports and Records; Audit**

        1.     If requested by Franchisor in advance, Franchisee shall submit to Franchisor a financial operating statement (statement of profit and loss) and balance sheet for the Franchised Business for any particularly specified monthly or quarterly period on forms specified, approved, or provided by Franchisor, and completed according to their terms.

        2.     If requested by Franchisor in advance, within sixty (60) days after the close of Franchisee's fiscal year during the term of this Agreement, Franchisee shall submit to Franchisor a statement of financial condition (a balance sheet and profit and loss statement) relating to the Franchised Business as of the end of said fiscal year, on forms specified, approved, or provided by Franchisor and completed according to their terms.  If this statement shows that there has been any underpayment of royalty-service fees based on Gross Sales as finally adjusted and reconciled after the closing and review of Franchisee's books and records, Franchisee shall pay to Franchisor, at the time of submitting such statement, the amount of any such underpayment plus all late fees as due under Section II.A.2.  Payment and acceptance of such amounts shall not waive or prejudice any right of Franchisor to exercise any other remedy

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

of this Agreement, including termination in accordance with Section X. of this Agreement.  Any over payment shall be credited to Franchisee's account.

3.      Franchisee shall maintain full, complete and accurate books and records. The books and records shall clearly and accurately show Gross Sales as defined herein.  All such books and records applicable to the Franchised Business, including bank statements, Franchisee's business and personal income tax returns, and all business plans prepared by or for Franchisee, shall be open at all reasonable times to inspection and verification by Franchisor or its duly authorized representatives.  Further, at Franchisor's request, Franchisee will deliver copies of the foregoing books and records and tax returns to Franchisor.

4.      Franchisor shall be entitled at any time to have Franchisee's books and records examined or audited at Franchisor's expense and Franchisee shall cooperate fully with the parties making such examination or audit on behalf of Franchisor.  Franchisee shall promptly pay to Franchisor or Franchisor shall credit to Franchisee's account, as the case may be, any under or overpayment of fees revealed by the examination or audit.  If an examination or audit is performed due to Franchisee's failure to submit statements of Gross Sales or to maintain books and records as prescribed herein, or in the event that the Gross Sales reported by Franchisee for any period of twelve consecutive months are more than three percent (3%) below the actual Gross Sales of Franchisee for such period as determined by any such examination or audit, or in the event the examination or audit reveals one or more violations by Franchisee of the territory boundary restrictions, then Franchisee shall within fifteen (15) days following notice, pay to Franchisor the full cost of such examination or audit as well as all additional amounts of fees and late charges shown to be due.  Payment and acceptance of such amounts shall not waive or prejudice any right of Franchisor to exercise any other remedy of this Agreement, including termination in accordance with Section X. of this Agreement.

5.      Franchisee shall submit to Franchisor such other periodic reports, forms and records as specified, and in the manner and at times specified in the Operations Manual or otherwise in writing.  All reports, forms, and records submitted to Franchisor shall be true, accurate and complete.

6.      Any and all reports, forms and records submitted to Franchisor by Franchisee shall be kept confidential; except for (1) Franchisor's use of financial information in preparation of an earnings claim to be used in Franchisor's franchise disclosure document (without specifically identifying Franchisee); (ii) any information that is required to be disclosed in Franchisor's franchise disclosure document under applicable law; (iii) any information required to be disclosed by Franchisor pursuant to a subpoena, order or other legal requirement of any court or governmental agency; and iv) unless otherwise noted herein.

## III.    ADVERTISING-PROMOTION

A.      **Advertising-Promotion Contribution.**    Franchisee shall pay monthly to Franchisor on or before the 10th day of the month for the preceding calendar month throughout the term of the franchise, along with and in addition to the royalty-service fee provided by Section II.A. of this Agreement, an advertising-promotion contribution in the dollar amount calculated as

DBR.FA 0309

HouseMaster ∘ HouseMaster ∘ HouseMaster ∘ HouseMaster ∘ HouseMaster ∘ HouseMaster ∘ HouseMaster ∘ **HouseMaster** ∘ HouseMaster ∘ HouseMaster ∘ HouseMaster

a percentage of Franchisee's Gross Sales (as heretofore defined) for the previous month as shown below:

| Total Year-to-Date Gross Sales (defined in II.A.) Made by Franchisee During current calendar year | | Monthly advertising-promotion contribution payable (as a percentage of previous month's Gross Sales) |
|---|---|---|
| $0 - $125,000 | ... | 2½% of month's Gross Sales |
| $125,001 - $250,000 | ... | 2¼% of month's Gross Sales |
| Over $250,000 | ... | 2% of month's Gross Sales |

   Franchisor, without seeking or obtaining agreement with Franchisee, and not as a condition to the grant or acceptance of the franchise or rights hereunder, but strictly as a unilateral expression of intention and of business policy designed to enhance the competitive effectiveness and general public acceptance of the HOUSEMASTER name and Business, shall use such funds as it shall, in its sole discretion, deem beneficial to the HOUSEMASTER Method and franchisees of Franchisor.  Franchisor undertakes no obligation in using such funds to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or proportionately from the placement of advertising.   Such funds will be used solely for the payment of expenses incurred in connection with the general promotion of the Proprietary Marks, the HOUSEMASTER Method, and the franchise system, including the cost of formulating, developing and implementing advertising and promotional campaigns, and the reasonable costs of administration relating hereto, including reasonable administrative costs and overhead which Franchisor may incur in activities related to formulating, developing and implementing advertising and promotional campaigns.  Franchisor shall direct all marketing programs financed by such funds with sole discretion over the creative concepts, materials, endorsements, types of media and geographic allocation of media placement.  Franchisor owes no fiduciary duty to Franchisee in connection with the use of such funds or expenditure of such funds.

   **B.**  **Local Advertising Cooperative.**  In the event any local or regional advertising cooperative has been or may be formed by Franchisor consisting of franchisees in your local area or region ("Local Advertising Cooperative"), you agree to participate in and contribute your share to such Local Advertising Cooperative as determined by Franchisor in addition to the contributions and expenditures required for the Advertising-Promotion Contribution pursuant to Section III.A. The cost of the program shall be allocated among locations in such area and each franchisee's share shall be in proportion to its territory size based on owner-occupied homes. In no event, will you be required to contribute more than three percent (3%) of Gross Sales to the cooperative.  All advertisements and promotions effectuated through the Local Advertising Cooperative must be approved by Franchisor.  Franchisor assumes no direct or indirect liability or obligation to you to or to any local cooperative with respect to the maintenance, direction or administration of the cooperative, including without limitation, any failure by the any franchisees to make required contributions to the cooperative.

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

C.    **Approval of Local Advertising**.  Franchisee may in its own right and at its own expense advertise and promote HOUSEMASTER services, provided that all such advertising and promotional materials proposed to be used shall prior to use or publication be submitted to and approved in writing by Franchisor in the interest of maintaining the integrity, force, quality, image, and goodwill associated with the Proprietary Marks of Franchisor.  Franchisee is responsible for ensuring that all directory listings and advertisements are associated with Franchisee's Designated Geographic Area.  For paid directory listings and advertisements, Franchisee must designate one (1) town within the Franchisee's Designated Geographic Area, as an identifier that must also be used on all advertising and promotional materials (i.e. "Town name and surrounding areas").  All advertising and promotions by Franchisee shall be completely accurate and truthful, shall conform to all applicable laws and regulations relating to consumer advertising, and shall give notice that Franchisee's building inspection business is an independently owned and operated HOUSEMASTER franchise.  Franchisee shall indemnify and hold Franchisor harmless for Franchisee's violation of this paragraph.  All such advertising and promotional materials prepared, developed or used by Franchisee in connection with the Franchised Business (whether or not approved by Franchisor as required) shall become Franchisor's sole and exclusive property.

## IV.    OBLIGATIONS OF FRANCHISOR

A.    **Undertakings Prior to Commencement of Operations**.  Prior to Franchise's commencement of operations hereunder Franchisor shall:

1.    **Initial Training Program**.  Instruct Franchisee in the use of the HOUSEMASTER Method and  provide training in HOUSEMASTER's Marketing Strategy, which will cover basic sales and presentation skills and will provide marketing options that Franchisee has the discretion to choose to incorporate so as to assist it in marketing its services. The initial training program may be conducted in person at the principal offices of Franchisor or at such other location as Franchisor shall designate and/or by webinar or other online training. Because this training is offered by Franchisor in consideration for Franchisee abiding by the terms of this Agreement, there shall be no extra charge for persons attending who have been designated by Franchisee and who are otherwise acceptable to Franchisor, provided that Franchisee is in good standing under this Agreement, is current in payment of all fees and is in compliance with all of Franchisee's other contractual obligations.  However, all expenses of travel, lodging, meals and other living expenses incurred by Franchisee's designee(s) in attending or participating in such seminar shall be borne and paid for by Franchisee.

2.    **NIBI® Technical Training**.  Provide an initial technical training program through the National Institute of Building Inspectors (NIBI), which will be provided at the NIBI training center in Bound Brook, New Jersey.  Franchisee agrees to attend such technical training program or to cause such management and supervisory personnel as it shall designate, and who shall be acceptable to Franchisor, to so attend.  Because Franchisor offers NIBI technical training in consideration for Franchisee abiding to the terms of the Agreement, there shall be no additional charge for the technical training.  If Franchisee desires to have other of its personnel

attend subsequent training programs at the NIBI training center in Bound Brook, New Jersey, Franchisor will make this opportunity available at no training fee cost to Franchisee, provided training space is available at the particular training session requested and provided that Franchisee is in good standing under this Agreement, is current in payment of all fees and is in compliance with all of Franchisee's other contractual obligations. However, for all additional personnel of Franchisee who attend any NIBI training, Franchisor reserves the right to charge for the training materials provided by NIBI. All expenses of travel, lodging, meals and other living expenses incurred by Franchisee or its personnel in attending the technical training programs shall be borne and paid for by Franchisee. NIBI charges a fee for the initial technical training program and any subsequent NIBI training programs for the Franchisee and Franchisee's employees which are conducted via the Internet.

NIBI technical training provides Franchisee and its employees with instruction in the basics of home inspections. This initial education is not technically exhaustive and must be supplemented by educational programs and/or self-learning that provide additional information on construction materials and methods, as well as information on locally accepted and customary home inspection practices. Further, the initial NIBI instruction may not meet all the educational requirements necessary to obtain a home inspector license or certification, as may be required by local law. As stated in Section V.B.(6.), Franchisee is solely responsible for having all inspectors and the Franchised Business comply with all applicable local laws and regulations. Accordingly, Franchisee may be required to obtain additional instruction and/or to complete other requirements independently.

3.      **Successful Completion of Training**. The grant of the franchise herein is conditioned upon successful completion of the Initial Training Program and NIBI technical training by Franchisee. If during the course of the training programs or within fifteen (15) days thereafter Franchisor concludes that Franchisee has not exhibited the aptitude, abilities, or personal characteristics necessary or desirable to operate successfully a building inspection and related services business in accordance with the standards and procedures of the HOUSEMASTER Method and as a Franchisee of Franchisor, Franchisor may, in its sole discretion and judgment, terminate this Agreement and all rights hereunder, where permitted by applicable law, by giving notice to Franchisee and tendering to Franchisee a refund of its Initial Franchise Fee less the amount of Eight Thousand Five Hundred Dollars ($8,500.00) to cover a portion of the reasonable expenses incurred by Franchisor in connection with training Franchisee and initially granting the franchise. Franchisee agrees that such refund shall be the full extent of Franchisor's liability and responsibility in the event of such termination, and Franchisee and its owners shall execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, employees and agents. Upon termination of this Agreement, Franchisee shall abide by Section XI hereof. This includes, among other things, that Franchisee agrees to maintain strictly the confidentiality of all information received relating to the HOUSEMASTER Method and the HOUSEMASTER Marketing Strategy and not to use in the operation of a building inspection or similar business, any trade secrets, confidential information, copyrighted works or proprietary materials obtained from Franchisor in the course of the training program or otherwise.

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

4.     **HOUSEMASTER Manuals.**   Lend, subject to a deposit, to Franchisee two Manuals. The "Operations Manual" identifies the HOUSEMASTER Method of operation, as well as other required and suggested business practices and inspection procedures. The "Sales and Marketing Manual" identifies the HouseMaster Marketing Strategy, and provides suggestions on various marketing options to assist Franchisee in marketing its services. Franchisee shall pay a deposit for the HOUSEMASTER Manuals in the amount of Two Hundred Fifty Dollars ($250.00) at the time the Initial Franchise Fee is paid to secure return of the proprietary HOUSEMASTER Manuals at the cessation of the franchise relationship. In the event this Agreement is terminated or expired and Franchisee owes Franchisor any fees or contributions or otherwise has outstanding debt to Franchisor, Franchisor is entitled to keep the deposit as a set-off against amounts due to Franchisor.

**B.     Continuing Undertakings.**   Franchisor shall provide the following continuing services for the benefit of Franchisee:

1.     **Promotion.**   Use the advertising-promotion fund to develop and implement from time to time HOUSEMASTER promotional programs to enhance the competitive effectiveness and general public acceptance of the HOUSEMASTER name and service.

2.     **Promotional Aids.**   Make available from time to time marketing and sales promotion materials for purchase from third-party vendors.

3.     **Method Improvements.**   Furnish to Franchisee from time to time any and all improvements and additions to the HOUSEMASTER Method that are circulated generally to all other Franchisees.

4.     **Telephone Assistance.**   Be available to provide telephone counseling to Franchisee during regular business hours of Monday – Friday from 9:00am to 5:00pm EST with respect to the operation and management of the Franchised Business, and make available to Franchisee the benefits of Franchisor's information, advice, expertise and know-how.

5.     **Continuing Training.**   Provide, at the option of Franchisor, training programs for Franchisees and their employees at locations designated by Franchisor and/or on-line, which may be attended provided Franchisee is in good standing under this Agreement and is current in payment of all fees and is in compliance with all of Franchisee's other contractual obligations.

6.     **Other Support.**   Provide, at the option of Franchisor, assistance and support through an intranet portal ("Information Exchange"). Franchisee will be entitled to access the Information Exchange and upload reports in connection therewith provided that Franchisee is in good standing under this Agreement, is current in payment of all fees, is in compliance with all of Franchisee's other contractual obligations and abide by the posted Rules and Guidelines. Franchisee also agrees that it will regularly review the Information Exchange and will be deemed on notice of all information contained therein. Any software made available to Franchisee by Franchisor or any third party is done so at Franchisor's option and as an accommodation to Franchisee. Franchisor makes no representation, warranty or guaranty as to

the reliability, timeliness, quality, suitability or particular functionality of any software system, except if otherwise agreed in writing by Franchisor and Franchisee in a written software agreement. Further, any support provided to Franchisees for software systems is done so at franchisor's option as an accommodation to Franchisee and shall not be deemed an obligation of Franchisor.

     **C.    Audit of Franchised Business.**   To determine whether Franchisee and the Franchised Business are complying with this Agreement and the HOUSEMASTER Method, Franchisor and its representatives shall have the right at all times and without prior notice to Franchisee to enter and inspect the office of the Franchised Business, to accompany Franchisee on an inspection, or to otherwise observe Franchisee's operation or promotion of the Franchised Business. If the office of the Franchised Business is located in Franchisee's residence, Franchisor will provide notice prior to entering and inspecting the office. Franchisor and its representatives will have the right to interview Franchisee, Franchisee's employees and subcontractors, marketing contacts and customers pertaining to matters of compliance with this Agreement and the HOUSEMASTER Method and to photograph, videotape or audiotape any such interviews and/or observation of the operation of the Franchised Business with or without Franchisee's knowledge and without prior notice to Franchisee. Franchisee hereby consents to Franchisor's use of any such audio or video recording for training, marketing or any other purpose. Franchisee shall cooperate with Franchisor and its representatives in all respects in connection with any such inspection and audit provided that Franchisor's exercise of these rights will not unreasonably interfere with Franchisee's conduct of the Franchised Business.

**V.    OBLIGATIONS OF FRANCHISEE**

     In the interest of maintaining the integrity, force, quality, image and goodwill associated with the Proprietary Marks of Franchisor, Franchisee agrees to the following:

     **A.    Promotion of the HOUSEMASTER Method and Business.**  Franchisee agrees to conduct business during all normal business hours, as designated in the HOUSEMASTER Manuals, during the term of this Agreement and to promote at all times the sale of the building inspection and other services available from Franchisee pursuant to the HOUSEMASTER Method, as prescribed in the HOUSEMASTER Manuals, using its best efforts to develop and enlarge Franchisee's market for such services.

     **B.    Management Responsibility and Business Conduct.**

          1.    At all times during the term of this Agreement, Franchisee shall devote full time and effort to the active management and operation of its building inspection and related services business, shall be responsible for the management and operation thereof, and shall act on behalf of Franchisee in all dealings with Franchisor. Franchisee may employ a full-time manager for the Franchised Business only if Franchisee obtains Franchisor's prior written consent, which consent may be withheld at Franchisor's discretion; provided, however, Franchisee shall remain active in overseeing the operations of the Franchised Business conducted under the supervision of the manager. Any manager must attend the Initial Training Program and complete it to Franchisor's satisfaction prior to managing the operations of the Franchised

DBR.FA 0309

HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● **HouseMaster** ● HouseMaster ● HouseMaster ● HouseMaster

Business.  Any manager employed by Franchisee must sign a confidentiality agreement with Franchisee in a form acceptable to Franchisor which includes covenants not to compete for the protection of Franchisee, Franchisor and the franchise system.

2.      Franchise understands, hereby acknowledges and agrees that the kinds and extent of business results achieved, and the financial returns and profits, if any, expected or realized from the investment in, and the operation of, the building inspection and related services business franchised hereunder to use the HOUSEMASTER Method, depend principally and substantially on Franchisee's direct, personal and active continuous participation in the management, administration and operation of such business.

3.      Franchisee will at all times give efficient and courteous service to the public, adhere to high standards of business ethics, integrity and fair dealing, and do nothing which would tend to discredit or in any manner damage the reputation and goodwill of Franchisor, the HOUSEMASTER Method, Franchisee, or other franchisees of Franchisor.

4.      Franchisee shall make all payments and reports, and pay all debts, when due.  To the extent such payments are delinquent, Franchisor reserves the right to assess a Ten Dollar ($10.00) per day penalty or to apply a per annum interest rate of eight percent (8%) while such payments are outstanding.

5.      Franchisee shall at all times provide notice of the franchise relationship.  Franchisee shall hold himself out to the public as an independent business owner operating the business pursuant to a franchise from Franchisor.  Franchisee shall take such affirmative action as may be necessary to clearly disclose the franchise relationship, including without limitation, exhibiting a notice of the fact on all signs, forms, stationery, contracts, advertising and promotional materials, and other written materials, the content of which Franchisor has the right to specify.  As described in Section VI.B. herein, Franchisee's Firm Name, and not the name of Franchisor, (DBR Franchising, LLC. or any derivative thereof), must be exclusively used on all inspection order agreements and inspection reports.

6.      Franchise shall conduct its business in accordance with all federal, state, local or other governmental laws, statutes, ordinances, regulations or rules applicable to the Franchised Business, whether now in force or hereinafter enacted, including without limitation all such laws and regulations relating to occupational hazards and health, consumer protection, discrimination, employees, employment and employee benefits, sexual harassment, worker's compensation, unemployment insurance and withholding and payment of federal and state income taxes and social security taxes, and payment of sales, use, excise, property or other taxes relating to the Franchised Business and to make all contributions that may be required or demanded under or by virtue of such legislation, rules or regulations.  Franchisor shall have no liability for any sales, use, excise, property or other taxes of Franchisee or the Franchised Business.  Franchisee, at its own expense shall obtain and maintain all permits, certificates, and licenses required to engage in the building inspection and related services business.  To the extent that local laws or regulations require that inspectors be licensed or registered in order to conduct building inspections and related services in Franchisee's ROF Territory, Franchisee shall only permit building inspections and related services to be conducted by inspectors meeting all

DBR.FA 0309

HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● **HouseMaster** ● HouseMaster ● HouseMaster ● HouseMaster

applicable licensing or registration requirements. Franchisee, at its own expense, shall have all written materials used in the operation of the Franchised Business, including but not limited to marketing and advertising materials, inspection forms and contracts, reviewed by an attorney to insure compliance with all applicable state and local laws and regulations prior to the use of each such item. Franchisee shall indemnify and hold Franchisor harmless for Franchisee's failure to comply with this paragraph.

7. Franchisee warrants that it and all members of its immediate family will not directly or indirectly engage in or acquire any financial or beneficial interest in any other inspection or real estate business during the term of this Agreement without the advance written consent of Franchisor. This includes but is not limited to any business that may perform inspections and related services (such as wood destroying insect testing and/or treatment, water testing, radon gas testing and/or mitigation, mold testing, septic tank evaluations and/or cleaning, lead paint testing, buried tank testing, preventative maintenance inspections, safety inspection, real estate sales or mortgage broker services, and inspection-related fee paid speaking or training engagements).

8. Franchisee warrants that it will cause all inspections to be performed only by inspectors who are trained by the National Institute of Building Inspectors or an equivalent program acceptable to Franchisor and have obtained all required state and local licenses. Franchisee shall submit to Franchisor satisfactory proof of completion of all training other than NIBI training and obtain Franchisor's written consent thereof. All inspectors employed by Franchisee shall as a condition of employment sign a confidentiality agreement with Franchisee in a form acceptable to Franchisor which includes covenants not to compete for the protection of Franchisee, Franchisor and the franchise system. Franchisee shall maintain a file of all such inspector agreements, and will upon request provide Franchisor with copies of such agreements. Franchisee shall indemnify, defend and hold harmless Franchisor, its affiliates and their respective officers, directors, employees and agents against any and all claims arising out of inspections performed by Franchisee's inspectors.

9. Franchisee or at least one manager of Franchisee's staff shall each year during the term of this Agreement attend Franchisor's Annual Conference/Regional Meeting of franchisees if Franchisor holds the conference or meetings. Franchisee (and not management personnel in lieu of Franchisee) must attend the first Annual Conference held after Franchisee's purchase of the franchise, including where such purchase is by assignment of an existing franchise agreement. If Franchisee fails to attend the first Annual Conference, Franchisee must nevertheless pay Franchisor the Annual Conference Regional Meeting Registration Fee ("Conference Registration Fee"). The Conference Registration Fee shall be fixed by Franchisor at an amount not to exceed One Thousand Dollars ($1,000.00) ("Conference Registration Fee"), which amount may be adjusted annually to reflect increases in the national consumer price index. The Conference Registration Fee shall be payable to Franchisor by Franchisee whether or not Franchisee or a manager attends the conference or meeting. This provision shall not obligate Franchisor to hold an Annual Conference/Regional Meeting of franchisees each year. If no Annual Conference/Regional Meeting is held, Franchisee shall not be obligated to pay the Conference Registration Fee. This clause shall not be waived. If Franchisee fails to attend three (3) or more conferences during the term of this Agreement, Franchisor has the right to require

Franchisee to attend training, in addition to any other rights and remedies available to Franchisor for Franchisee's breach of this provision.

10.    Throughout the term of this Agreement, Franchisee shall have a minimum of one (1) operational and functioning dedicated telephone line for use exclusively by the Franchised Business.  Franchisee shall provide for live answering of the telephone line for the Franchised Business in the manner set forth in the HOUSEMASTER Manuals.  If Franchisee's telephone is physically located outside the licensed Designated Geographic Area, this telephone number may be given a free listing in the associated telephone book and in the directory for that area and could be considered advertising. Therefore, the telephone number listed in the telephone book outside the DGA must be listed under Franchisee's corporate name, not HOUSEMASTER. Franchisee is responsible for ensuring that all directory listings and advertisements are associated with Franchisee's Designated Geographic Area. For paid directory listings and advertisements, Franchisee must designate one (1) town within Franchisee's Designated Geographic Area as an identifier that must be used on all such listings and advertising and promotional materials (i.e. "Town name and surrounding areas") to clarify markets in the event multiple HOUSEMASTER offices are listed in one directory.  Franchisee must follow all policies and procedures governing identification as set forth in the HOUSEMASTER Manuals.

11.    Franchisee shall in the operation of the Franchised Business use only stationery, advertising and promotional materials, reports and forms that meet Franchisor's standards and specifications and use the Proprietary Marks and colors as prescribed from time to time by Franchisor.  All materials used must disclose the franchise relationship.

12.    Franchisee shall acquire and use in the operation of the Franchised Business such computer hardware and software as may be required by Franchisor.  Franchisee acknowledges and agrees that computer skills are necessary for the proper operation and marketing of the Franchised Business. Franchisee shall, throughout the term of this Agreement, maintain an active e-mail account and have high-speed access to the Internet for receiving bulletins, updates and other information from Franchisor.  Franchisee agrees to regularly monitor said account.  Franchisee shall be required to purchase or lease certain proprietary software from Franchisor or a third party designated by Franchisor, to enter into a software license agreement with Franchisor or such third party, and to purchase ongoing support services for the proprietary software from Franchisor or a third party designated by Franchisor.  Franchisor reserves the right to access information and data in connection with the Franchised Business produced by Franchisee's computer system.

13.    Franchisee shall at all times maintain a current database of information on all customers, marketing contacts and other contacts on the computer system for the Franchised Business.  Said database shall be the sole property of Franchisor.

14.    Franchisee shall not perform building inspections or related services for or as a result of a referral, either direct or indirectly, from any of Franchisee's immediate family members who are engaged in the real estate brokerage business.

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

17

C.   **Insurance.**  Franchisee alone shall be responsible for all loss or damage arising out of or relating to the operation of the Franchised Business or arising out of the acts or omissions of Franchisee or any of its agents, servants or contractors in connection with services offered or rendered by Franchisee, and for all claims for damage to property or for injury or death of any person or persons directly or indirectly resulting there from, and Franchisee agrees to indemnify, defend and hold Franchisor, its affiliates and their respective officers, directors, employees and agents harmless against and from any and all such claims, loss, and damage, including, but not limited to, costs and attorneys' fees.

Franchisee shall obtain and at all times during the term of this Agreement maintain in force and pay the premiums for automobile insurance on all vehicles used during the operation of the Franchised Business, whether or not owned by Franchisee, with limits of liability for bodily injury of not less than $500,000.00 for each person injured and $500,000.00 for property damages on each occurrence or a combined single limit of $500,000.00. Such policies shall not have a deductible of more than $10,000.00.

Franchisee shall obtain and at all times during the term of the Agreement maintain in force and pay the premiums for general liability insurance with limits of liability for bodily injury of not less than $500,000.00 for each person injured and $500,000.00 for property damages on each occurrence or a combined single limit of $500,000.00. Such policies shall not have a deductible of more than $10,000.00.

Franchisee shall obtain and at all times during the term of the Agreement maintain in force and pay the premiums for employer's liability and workers' compensation insurance provided by applicable law.

Franchisee shall obtain and at all times during the term of the Agreement maintain in force errors and omissions (E&O) insurance, including bodily injury insurance coverage (for injury resulting from services performed), for all inspections and services performed with a limit of liability of not less than $500,000.00 for each occurrence and a deductible of not more than $10,000.00 and including prior acts coverage for all past inspections. Franchisee shall have the option to obtain the required E&O insurance through Franchisor if such is available. Subsequent to the termination or expiration of this Agreement, and as long as necessary to provide coverage for claims and liability arising from all inspections and services performed by Franchisee prior to the date of termination or expiration, but in any event for the longer of three (3) years following the termination or expiration of this Agreement, and as long as necessary to protect Franchisor from all liability, actions, or claims arising from all inspections and services performed by Franchisee in the operation of the Franchised Business, Franchisee shall maintain in force and pay the premiums for E&O with bodily injury insurance coverage for prior acts protecting Franchisor with a limit of liability of not less than $500,000.00 for each occurrence and a deductible of not more than $10,000.00. If Franchisee fails to procure this extended reported period insurance within thirty (30) days of expiration or termination of this Agreement, Franchisee will be assessed a fine equal to the greater of $5,000 or the cost of this insurance.

Said policies of insurance shall be on forms, upon terms and with insurers reasonably satisfactory to Franchisor. Upon reasonable notice to Franchisee, Franchisor may reasonably

increase the minimum liability protection requirement or decrease the maximum deductible or require different or additional limits or kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards or other relevant changes in circumstances.

Said policies of insurance shall expressly protect both Franchisee and Franchisor from liability and action. Franchisor must be named in all policies as a co-insured or an additional named insured. Franchisor's affiliate, HI Training, LLC. d/b/a NIBI must also be named as a co-insured and/or additional insured. Franchisee shall furnish to Franchisor a certified copy of the certificate with respect to each such policy, which provides that such policy shall not be canceled or modified except upon 30 days prior written notice to Franchisor. If Franchisee fails to obtain or maintain in force any insurance as provided herein or to furnish the certificates required hereunder, Franchisor may, in addition to other remedies it may have, maintain or obtain such insurance and/or certificates, and Franchisee shall promptly reimburse Franchisor for all premiums and other costs incurred thereby.

If Franchisee engages any independent contractors to perform other services for customers of the Franchised Business, such independent contractors must have in force at the time of performing such services E&O insurance and bodily injury insurance (for injury resulting from errors and omissions) for all inspections and services performed with a limit of liability of not less than $500,000.00 for each occurrence and a deductible of not more than $10,000.00. Such insurance policy must name Franchisee and Franchisor as additional insureds under the policy. Franchise shall obtain from each such independent contractor a certified copy of the certificate of insurance evidencing such coverage prior to the date the independent contractor performs any services for the Franchised Business. Maintenance of any insurance required by this Agreement shall not relieve Franchisee of the indemnification obligation under this Agreement.

D.     **Indemnification by Franchisee.** Franchisee shall be solely responsible for all loss, damage and liability arising out of or relating to the operation of the Franchised Business. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name. Further, Franchisor will in no event assume liability for, or be deemed liable hereunder, as a result of any such action, or by reason of any act or omission of Franchisee in its conduct of the Franchised Business, or any claim or judgment arising there from against Franchisee. Franchisee agrees, for itself and its successors and assigns, to indemnify, defend and hold harmless forever, Franchisor, its successors and assigns, affiliates, subsidiaries, and their respective officers, directors, agents, employees and representatives, past and present, against any and all claims, judgments, damages, suits, losses, penalties, fines, expenses, costs, settlements and liabilities (including, but not limited to, reasonable attorneys' fees, expert witness fees, costs of investigation, court costs, and related travel and living expenses) of any kind or nature which hereafter may be brought or instituted against any or all of them, or their successors and assigns, by or on behalf of anyone claiming rights or injury arising directly or indirectly from, as a result of, or in connection with the operation of the Franchised Business, whether or not such claims, judgments, damages, suits, losses, penalties, fines, expenses, costs, settlements or liabilities were actually or allegedly caused wholly or in part through the negligence of Franchisor, its successors and assigns, affiliates and subsidiaries or any of their

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

respective officers, directors, representatives, agents or employees or resulted from any strict liability imposed on Franchisor or any of its agents or employees. Franchisor shall have the option to control its own defense and to select counsel of its own choosing at the expense and risk of Franchisee. Such an undertaking by Franchisor shall, in no manner or form, diminish the obligation of Franchisee to provide the foregoing indemnity of Franchisor and the foregoing parties and to hold Franchisor and the foregoing parties harmless. The indemnities and obligations set forth in this Agreement will continue in full force and effect subsequent to the expiration or termination of this Agreement.

Franchisee shall be solely responsible for handling, managing and participating in the defense of all claims and/or lawsuits related in any way whatsoever to the Franchised Business, whether such claims arise during the term of this Agreement or after its termination or expiration. In the event Franchisee's client asserts claims or potential claims against Franchisor, Franchisee and its employees agree to fully cooperate with Franchisor in any investigations or other efforts to defend the claims asserted.

E. **Necessary Limitations of Services**. All services provided by Franchisor for the benefit of Franchisee, including but not limited to, technical and marketing advice, suggestions or recommendations are to be used by Franchisee at its own risk. Because any advice, suggestion or recommendation rendered is necessarily limited in scope to the extent that it may not consider local custom, practice, law or other nuance, Franchisor is unable to make any warranty or representation, either express or implied, with respect to the accuracy, reliability or completeness of the information provided or the result of the use of the information provided.

## VI. PROPRIETARY MARKS

A. **Validity and Use**. The franchise granted hereunder and the HOUSEMASTER Method are operated in connection with and through the use of various works of authorship protected by U.S. Copyright law, as well as trademarks, trade names, and service marks along with certain related words, slogans, letters, and symbols (all of which are hereafter collectively referred to as "the Proprietary Marks"). The Proprietary Marks may include, but are not limited to, those registered, or which may become registered, in the United States Patent and Trademark Office and in other countries.

Franchisor hereby grants a non-exclusive license to Franchisee to use during the term and any successive term the following Proprietary Marks in relation to the franchise granted hereunder in accordance with the terms and conditions of this Agreement: "HouseMaster®", "The Home Inspection Professionals®", "Express® Report", "Experience, The HouseMaster Difference®", "The Guaranteed Inspection People®", "More Than a Home Inspection®", and "HouseMaster Home Inspections. Done Right®" and any permitted variations thereof. Some current examples of copyrighted works, which may change from time to time, include the Inspection Order Agreement, the Express Report, the Limited Inspection Guarantee, the HouseMaster websites (including www.housemaster.com), marketing materials such as brochures and the Inspection Resource Guide and variations thereof. Franchisor reserves the right to alter, change or amend the Proprietary Marks referred to herein and to add proprietary names and marks to those franchised hereunder. Franchisor does not warrant the availability or

validity of said marks. In the event that the right to use any name or proprietary mark granted to Franchisee in connection herewith is threatened by anyone else, or if a registration application for any such name or mark is denied or invalidated, or if Franchisor should desire to substitute another name or service mark, Franchisor shall have the right to substitute a different name or mark and the substituted name or mark shall be accorded the same treatment as provided for herein.

As between the parties hereto, Franchisee acknowledges the validity of the Proprietary Marks and acknowledges that they are solely the property of Franchisor. Franchisee hereby agrees to use the Proprietary Marks only for so long as the right and franchise granted herein remain in force, and only in connection and in accord with the HOUSEMASTER Method, and in compliance with this Agreement and other standards, specifications and guidelines issued by Franchisor from time to time relating to the proper use of the Proprietary Marks. Franchisee further acknowledges that its right to use the Proprietary Marks is derived solely from this Agreement and that all such usage and any goodwill established thereby shall inure to the exclusive benefit of Franchisor.

Use of the Proprietary Marks shall in every instance be accompanied by the registration symbol ® or the ™ or ℠ symbol, or copyright symbol© placed in close proximity to the Proprietary Mark as directed by Franchisor. In addition, any and all advertisements, brochures or other promotional materials bearing the Proprietary Marks shall contain one of the following statements: "HouseMaster® is a registered mark of DBR Franchising, LLC." or "HouseMaster® is a registered mark and is used under license by [Franchisee to insert business entity of Franchisee]." As indicated elsewhere in this Agreement, all such materials should also provide that each HouseMaster franchise is independently owned and operated.

Franchisee shall not for its own account register any of the Proprietary Marks on the Internet or any other computer on-line service, which shall preclude using the Proprietary Marks as a domain name. Franchisee shall not either directly or indirectly create, develop, maintain, and/or use its own website, blog, vlog, social network, or other on-line venue or communication on the Internet using any of the Proprietary Marks, or otherwise use any of the Proprietary Marks on the Internet in any other manner including for search engine advertising purposes without the prior written consent of Franchisor.

Franchisee shall not, either during or after the term of this Agreement do anything, or aid or assist any other party to do anything, which would infringe upon, harm, dilute or contest the rights of Franchisor in any of the Proprietary Marks or in any other mark or name which incorporates the name HOUSEMASTER. Franchisee acknowledges and agrees that all rights, benefits and goodwill that may develop in the Proprietary Marks shall inure and accrue to the full and exclusive benefit of Franchisor.

B. **Firm Name.** Franchisee shall operate, advertise, and promote the Franchised Business and its services under any name approved in writing by Franchisor ("Firm Name"), and shall designate in conjunction therewith that Franchisee is an independent HOUSEMASTER franchisee. Franchisee shall not, however, use the name "HOUSEMASTER," or any other portion thereof or any other name containing such name, or any other name similar to or any

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

other of the Proprietary Marks in or as part of the business entity name of Franchisee.  Nor may Franchisee use "DBR Franchising" or any portion thereof as part of Franchisee's business entity name.  Franchisee shall, upon request of Franchisor at any time, immediately stop the use of any such name or word in its business entity name, and shall promptly take such steps as may be necessary or appropriate in the judgment of Franchisor to remove any such name or word from Franchisee's business entity name.  Franchisee's Firm Name must be exclusively used on all inspection order agreements and inspection reports.   Designations for "doing business as" (d/b/a) or "operating as" (o/a) shall not contain any geographic designation, such as HouseMaster of New Jersey.

     C.    **Unauthorized Use.**  Franchisee shall promptly report to Franchisor any unauthorized use of the Proprietary Marks that come to its attention in any manner whatever.  Upon request of Franchisor, Franchisee agrees to cooperate with Franchisor in preventing unauthorized use of the Proprietary Marks, or any confusingly similar mark, or in any court or administrative proceeding involving the Proprietary Marks, at the sole expense of Franchisor.

## VII.   HOUSEMASTER METHOD AND MARKETING STRATEGY

     A.    **Confidentiality.**  Franchisee hereby acknowledges that only Franchisor can franchise the proprietary rights in the HOUSEMASTER Method and all parts thereof, and of all material and information divulged to Franchisee relating to the HOUSEMASTER Method and Marketing Strategy.  Franchisee further acknowledges that the HOUSEMASTER Method and Marketing Strategy, each part thereof and in its entirety, constitutes trade secrets, confidential and proprietary business information of Franchisor which are revealed to Franchisee in trust and in confidence solely for the purpose of enabling Franchisee to establish and operate the Franchised Business.  Such trade secrets, confidential and proprietary business information include, but are not limited to, business procedures and processes, supplier and material lists, customer information and data, proprietary contact management software, contact or service provider information or data, training and operations manuals and materials, promotional and marketing manuals and other aids, business forms and accounting procedures, informational bulletins and software.  Franchisee acknowledges that all such information including all data contained in any database whether prepared by Franchisee or Franchisor, including, but not limited to, the contact management software system, belongs to Franchisor.  Franchisee agrees that during and after the term of this Agreement, it will not reveal any of such information to any other person or firm, except to employees of Franchisee, and then only in trust and in confidence, and only to the extent such knowledge is necessary to perform the duties of their employment.  Franchisee agrees, further, that during and after the term of this Agreement it will not use any of such trade secrets or confidential business information in any manner in connection with any business or venture in which it has or may acquire any interest, direct or indirect, in any capacity whatever, other than in connection with the operation of the Franchised Business.

     B.    **Use of and Improvements to the Method.**  In order to assure maximum uniformity of quality and service in all inspections made by all franchised inspectors, Franchisee agrees to follow the procedures prescribed by the HOUSEMASTER Method.  As Franchisor develops or learns of improvements, it will so notify franchisees and authorize their use in the Franchised Business.  In return and in consideration therefore, Franchisee agrees that any idea or

suggested innovation or variation which may tend to enhance or improve the HOUSEMATER Method including all writings and other original works of authorship regardless of form, including, but not limited to software programs, trademarks, copyrightable works, Internet Web page or any other document or information pertaining or relating to the Franchised Business that Franchisee discovers or otherwise becomes aware of during the term of this Agreement shall be submitted to Franchisor for its evaluation for adoption and use. Franchisee agrees that all proprietary rights to such ideas, works, innovations or variations created or acquired by Franchisee or any of its employees, during the term of this Agreement shall be deemed by the parties to be works made for hire and shall belong to Franchisor and may be made available to other HOUSEMASTER franchisees. Franchisee recognizes and agrees that from time to time Franchisor may modify the HOUSEMASTER Method, including the adoption and use of new or modified trade names, trademarks, or service marks, new copyrighted materials, new computer or new techniques. Franchisee will accept, use and offer any such changes in the HOUSEMASTER Method as if they were a part of this Agreement at the time of execution hereof and will implement such changes within a reasonable period of time. Franchisee shall make such expenditures as such changes or modifications in the HOUSEMASTER Method may reasonably require.

C. **HOUSEMASTER Manuals.** Franchisor will loan, subject to Franchisee paying Franchisor a deposit of $250, to Franchisee during the term of the franchise one copy of the HOUSEMASTER Operations Manual and the HOUSEMASTER Sales and Marketing Manual ("HOUSEMASTER Manuals") for the Franchised Business, containing mandatory and suggested specifications, standards and procedures prescribed from time to time by Franchisor for HOUSEMASTER businesses and information relative to other obligations of Franchisee hereunder. Franchisee shall keep confidential the contents of the HOUSEMASTER Manuals both during the term of this Agreement and subsequent to its expiration or termination. Franchisee shall comply with the procedures identified as the HOUSEMASTER Method, as prescribed from time to time by Franchisor in the HOUSEMASTER Manuals or otherwise. Franchisee shall prevent unauthorized use or disclosure of the HOUSEMASTER Manuals.

Franchisor shall have the right from time to time to add to, and otherwise modify, the HOUSEMASTER Manuals to reflect changes in authorized products and services, and specifications, standards and operating procedures of a HOUSEMASTER Business, provided that no such addition or modification shall alter Franchisee's fundamental status and rights under this Agreement. Franchisee shall keep its copy of the HOUSEMASTER Manuals current, and the master copy maintained by Franchisor at its principal office shall be controlling in the event of a dispute relative to the contents of the HOUSEMASTER Manuals.

The HOUSEMASTER Manuals shall remain the sole property of Franchisor, and Franchisee shall return it to Franchisor immediately upon the expiration or termination of this Agreement.

## VIII.   RIGHTS AND LIMITATIONS ON ASSIGNABILITY BY FRANCHISEE.

A. **Assignment of Franchise Rights.** The rights and franchise granted are personal in nature to Franchisee who is a party to this Agreement. Franchisee hereby agrees not to sell,

assign, transfer, convey, or encumber this Agreement or any right or interest therein or thereunder, or to suffer or permit any such sale, assignment, transfer, conveyance or encumbrance to occur by operation of law, without the prior written consent of Franchisor. Any attempt by Franchisee to so assign or encumber any interest or right hereunder without such prior written consent shall constitute cause for the immediate termination of this Agreement and all of Franchisee's rights hereunder. Such consent shall not be unreasonably withheld; however all of the following conditions must be met prior to the time of transfer:

1. The assignee-franchisee successfully demonstrates to Franchisor's satisfaction that it meets Franchisor's educational, managerial and business standards for new franchisees; possesses a good moral character, business reputation and credit rating; has the good health, aptitude and ability to conduct the Franchised Business; and has adequate financial resources and capital to operate the Franchised Business. If the assignee-franchisee is a corporation or other business entity, the terms of the preceding sentence shall apply to all individuals who own any interest in the assignee-franchisee;

2. The assignee-franchisee successfully completes Franchisor's Initial Training Program;

3. All of Franchisee's accrued monetary obligations to Franchisor and its affiliate are satisfied, and Franchisee is not in default under this Agreement;

4. The assignee-franchisee enters into a written agreement in a form satisfactory to Franchisor assuming and agreeing to discharge all of Franchisee's obligations and covenants under this Agreement for the remainder of its term, or at Franchisor's option, execute Franchisor's then-current standard form of franchise agreement (which may provide for different royalties and advertising fees, term and other rights and obligations from those provided in this Agreement). If the assignee-franchisee is a corporation or other business entity, Franchisor may, in its sole discretion, require the owners of such entity to execute and deliver to Franchisor forms of personal guaranty and subordination satisfactory to Franchisor;

5. Franchisee and/or the assignee-franchisee will have paid Franchisor a transfer fee in the amount of Four Thousand Dollars ($4,000.00) for the costs incurred by Franchisor as a result of the transfer. There will be no transfer fee payable with respect to transfers by Franchisee to new, wholly-owned solvent corporations formed solely to own and operate the franchise on its behalf.

6. Franchisee and each of its owners (if Franchisee is an entity) shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliate, and their respective officers, directors, employees and agents.

7. Franchisee shall have obtained and paid the premiums for an Errors and Omissions and bodily injury insurance policy for a minimum of three (3) years covering all inspections and services provided by Franchisee prior to the date of the transfer or assignment naming Franchisor as an additional insured with minimum limits of liability as set forth in Section V.C. If Franchisee fails to obtain such coverage, Franchisor may, in addition to other

remedies it may have, obtain such coverage, and Franchisee shall promptly reimburse Franchisor for all premiums and other costs incurred thereby.

      B.    **Assignment of the Franchised Business With or Without Franchise Rights, and Franchisor's First Option to Acquire.**  In the event of any proposal to sell, assign, or transfer any right or interest in the Franchised Business, there shall first be submitted to Franchisor a copy of any bona fide written offer made or received, or if none, a statement in writing of all the items of the proposed offer made by the proposed purchaser, assignee or transferee.  Thereafter, Franchisor shall have the irrevocable first right and option to purchase or acquire any such right or interest on the same terms as stated in the offer or statement, and Franchisor may exercise such right and option by notifying Franchisee in writing of its election to do so within thirty (30) days after its receipt of the written offer or statement.

      If Franchisor does not so notify Franchisee within the thirty (30) day period, then the proposed sale, assignment or transfer of the Franchised Business may be made to a party other than Franchisor, subject to Franchisor providing its consent and the other conditions as provided in subparagraph VIII.A. but only on the terms set forth in the written offer or statement and only to the party therein identified.  Such sale, assignment or transfer shall constitute a termination of all interests and rights of Franchisee under this Agreement whereupon all obligations of Franchisee under Section XI. and XII. of this Agreement shall be effective.

      If the proposed sale, assignment or transfer is not made within one-hundred-twenty (120) days after receipt by Franchisor of the written offer or statement, it shall be deemed withdrawn or rejected and the provisions of this Section VIII.B. shall renew and again be fully applicable.

      Any such sale, assignment or transfer to a third party is expressly subject to the provisions set forth in Section VIII.A. of this Agreement.

      C.    **Death or Disability of Franchisee.**  In the event of the death or disability of Franchisee, Franchisor will consent to an assignment and transfer of this Agreement on an interim basis to the personal representative of Franchisee, and subsequently to a relative or associate of Franchisee, provided, however, that each of the following conditions is fulfilled with respect to each such assignment and transfer:

         1.    It shall be demonstrated to the satisfaction of Franchisor that such personal representative, relative or associate is qualified, on the basis of character, business experience and capability, credit standing, health, and financial resources necessary to successfully operate the Franchised Business in accordance with the terms of this Agreement.

         2.    Any personal representative or relative/associate of Franchisee to whom this Agreement is assigned or transferred must be approved by Franchisor and shall have successfully completed the training courses then in effect for HOUSEMASTER franchisees.

         3.    There shall not be an existing default in any of the obligations of Franchisee hereunder, and all amounts owed to Franchisor as of the date of death or disability shall be paid in full.

DBR.FA 0309

HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● **HouseMaster** ● HouseMaster ● HouseMaster ● HouseMaster

25

4.    Such personal representative, relative or associate has submitted to Franchisor satisfactory evidence that he or she has become entitled to succeed to the rights of Franchisee hereunder, agrees to assume all obligations of Franchisee hereunder, and agrees to be bound by all the terms and provisions of this Agreement to the same extent and manner as Franchisee and executes such personal undertakings as Franchisor shall reasonably require.

The personal representative, relative or associate of Franchisee seeking permanent assignment or transfer of this Agreement to him or her must meet all of the foregoing conditions and obtain Franchisor's consent within one-hundred-eighty (180) days of death or disability.  In the event that the personal representative, relative or associate has not requested Franchisor's consent to assignment of this Agreement or has not fulfilled all of the foregoing conditions within one-hundred-eighty (180) days of Franchisee's death or disability, all rights granted to Franchisee under this Agreement shall, at the option of Franchisor, terminate automatically and revert to Franchisor.

Any consent of Franchisor hereunder shall not constitute consent to any subsequent assignment or transfer.

D.    **Transfer to Controlled Business Entity.**  This Agreement may be transferred or assigned by Franchisee to a business entity which is owned by Franchisee, provided that each of the following conditions is met to the satisfaction of Franchisor prior to the time of transfer or assignment:

1.    All accrued money obligations of Franchisee to Franchisor and all other trade creditors shall be satisfied prior to the transfer or assignment becoming effective and there shall be no existing default in the performance or observance of any of Franchisee's obligations under this Agreement or any other agreement with Franchisor or any of its affiliates.

2.    The transferee or assignee is duly organized or formed and validly existing in good standing under the laws of the state of incorporation or formation.

3.    Franchisee shall at all times possess direct voting control of the transferee or entity.

4.    Franchisee shall at all times be the principal officer of the transferee or assignee entity, with direct control over the entity's day-to-day operations.

5.    The entity's organizational documents, operating agreement or partnership agreement, as applicable, will recite that this Agreement restricts the issuance and transfer of any ownership interests in the entity and all certificates of ownership in the entity will bear a legend referring to this Agreement's transfer restrictions.

6.    The transferee or assignee taking assignment of this Agreement, and all individuals or entities that possess ownership interests in the entity, shall enter into a written assignment agreement with Franchisee and Franchisor, in a form satisfactory to Franchisor,

wherein the transferee or assignee assumes all of Franchisee's rights and obligations under this Franchise Agreement with Franchisor, and agrees to be bound by all the terms and provisions of this Agreement to the same extent and manner as Franchisee is under this Agreement.

7.    All individuals or entities that possess ownership interests in the transferee or assignee taking the transfer or assignment of this Agreement, shall enter into a written agreement in a form satisfactory to Franchisor, whereby such owners jointly and severally guarantee the full payment and performance of transferee's or assignee's monetary and non-monetary obligations to Franchisor, notwithstanding the transfer or assignment.

8.    Franchisee furnishes prior written proof to Franchisor substantiating that the transferee or assignee will be financially able to perform all of the terms and conditions of a Franchise Agreement with Franchisor and meets other standards that Franchisor customarily applies to new franchisees.

9.    Any transferee or assignee to which this Agreement is transferred or assigned shall confine its business activities exclusively to operating the real estate inspection and related services business licensed under, and pursuant to the terms of, this Agreement.

10.    New ownership interests in the entity shall not be issued without Franchisor's prior written consent, and all transfers or assignments of ownership interests in the transferee or assignee shall not be effective without Franchisor's prior written consent and having met all of the conditions of Section VIII.A.

Franchisee agrees to furnish Franchisor at any time upon request a certified copy of the organizational documents of the business entity that is the transferee or assignee, and a list, verified as being true and correct and in such form as Franchisor may require, of all owners of the business entity reflecting their respective interests. Any change in ownership or corporate structure in the business entity subsequent to the initial transfer must be made in compliance with Section VIII of this Agreement and with the prior written consent of Franchisor. Any attempted transfer or assignment, including changes in ownership or corporate structure without compliance with Section VIII and the prior written consent of Franchisor will be null and void and of no effect, and will convey no rights in or interest in the franchise granted therein, this Agreement or the Franchised Business.

## IX.    ASSIGNABILITY BY FRANCHISOR

This Agreement may be assigned by Franchisor or by any successor to any party or corporation which may succeed to the business of Franchisor or of such successor by sale of assets, merger, or consolidation or otherwise, and may also be assigned by Franchisor or by such successor to the shareholders thereof in connection with any distribution of the assets of said party or corporation. After the assignment of this Agreement to a successor that expressly assumes the obligations under this Agreement, Franchisor shall no longer have any further obligations under this Agreement.

DBR.FA 0309

HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● HouseMaster ● **HouseMaster** ● HouseMaster ● HouseMaster ● HouseMaster

27

## X.   TERMINATION

**A.   Termination by Franchisor for Cause.** Franchisee agrees that Franchisor may terminate this Agreement prior to the expiration of its terms if any of the following events or conditions occur by giving Franchisee written notice of termination, provided, that wherever a reason for termination is prohibited by, or a period of notice or a time allowed to cure a default as stated in this Section X is different from applicable law in effect as of the effective date of this Agreement, such reason shall be deemed deleted, and such period or time shall be deemed amended, to conform with such applicable law.

1.   Franchisee fails to make any payment of money owed to Franchisor when due, or fails to submit to Franchisor when due any report required pursuant to this Agreement, and such default is not fully cured within fifteen (15) days after Franchisor gives notice of such default to Franchisee.  At Franchisor's election, in lieu of or in addition to termination, Franchisor may institute arbitration or legal proceedings to recoup any outstanding money owed as provided herein at Section XIII;

2.   Franchisee is declared or becomes insolvent or bankrupt or makes an assignment for the benefit of creditors, or a receiver is appointed for its assets or business, or a proceeding is commenced by or against Franchisee for appointment of a receiver or for a reorganization or similar arrangement under state law or any provision of Federal Bankruptcy law, and if involuntary, such proceeding is not dismissed within thirty (30) days of the filing thereof.  Further, if Franchisee rejects the Franchise Agreement in accordance with Bankruptcy Code provisions, whether explicitly or implicitly by failing to timely assume the obligations of the Franchise Agreement, such rejection will be deemed a de facto termination as of the date of such rejection;

3.   Franchisee assigns or attempts to assign this Agreement, or to encumber it without the prior written consent of Franchisor;

4.   Subject to Section VIII.C. of this Agreement, Franchisee becomes unable to perform the obligations required or contemplated hereunder for a period of more than thirty (30) days;

5.   Franchisee vacates, deserts or otherwise abandons, or ceases to conduct the Franchised Business for more than seven (7) consecutive days;

6.   Franchisee jeopardizes the goodwill of Franchisor's Proprietary Marks, the Franchised Business, the HOUSEMASTER Method, or the reputation of Franchisor and fails to cure fully such default within fifteen (15) days following notice to Franchisee by Franchisor;

7.   Franchisee fails to maintain the confidentiality of the HOUSEMASTER Method and Marketing Strategy and all other proprietary information as provided in Section VII. of this Agreement;

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

8.      Franchisee repeatedly conducts itself or him/herself in an unprofessional and/or abusive manner to Franchisor, HOUSEMASTER franchisees and/or client(s) as determined by Franchisor in its sole but reasonable discretion and receives three (3) written notices of such misconduct by Franchisor;

9.      Franchisee defaults in the performance of the obligations assumed under Section V of this Agreement and fails to cure fully any such default within fifteen (15) days following notice to Franchisee by Franchisor except the obligation to maintain active errors and omissions insurance shall be subject to a seven (7) day cure period;

10.     Franchisee fails to hold itself or him/herself out as an independent business owner in accordance with Section V.B.5 and XIV.F and fails to cure fully any such default within fifteen (15) days following notice to Franchisee by Franchisor;

11.     Franchisee is convicted of a felony;

12.     Franchisee fails to adhere to any territory boundary restriction as contained in this Agreement after having previously received written notice of a territory boundary violation by Franchisor;

13.     Franchisee fails to comply with any applicable laws, regulations or licensing requirements, including timely payment of taxes or other fees required by law, including but not limited to Anti-Terrorism Laws.

14.     Franchisee reports to Franchisor Gross Sales of the Franchised Business for any period of twelve (12) consecutive months or longer as being less than the actual Gross Sales for the same period by three percent (3%) or greater;

15.     Franchisee fails to conduct the Franchised Business in accordance with all applicable laws and regulations.  This shall not prevent Franchisee from contesting in good faith the validity or applicability of any purported legal obligation to the extent and in the manner permitted by law;

16.     Franchisee fails to attend the first Annual Conference held by Franchisor after Franchisee's commencement of the Franchised Business, or in the case of Franchisee purchasing an existing franchise and accepting assignment of an existing franchise agreement with Franchisor, the first Annual Conference held by Franchisor after the date of the assignment to Franchisee;

17.     Franchisee has received three (3) or more notices with respect to Franchisee's obligations hereunder from Franchisor during the Term for failing to comply with this Agreement, or with any mandatory specifications, standards or operating procedures, which Franchisor may prescribe from time to time, including the requirement for the Franchised Business to have live telephone answering during regular business hours, regardless of whether those failures to comply were cured by the Franchisee;

18.     Franchisee fails to perform any obligation assumed by Franchisee under this Agreement, other than those specifically referred to above, and fails to cure fully any such default within thirty (30) days after Franchisor gives written notice of such default to Franchisee.

B.     **Termination by Franchisee for Cause.**     Franchisee may terminate this Agreement prior to the expiration of its term if Franchisor has materially breached any of its obligations under Section IV of this Agreement, provided, however, that Franchisee is itself in full compliance with this Agreement at the time of giving such notice of termination.  However, if Franchisee believes that Franchisor has failed to adequately provide any undertaking prior to Franchisee's commencement of operations, including the initial training, as provided by Section IV.A. herein, Franchisee shall notify Franchisor in writing within thirty (30) days following the start of the Franchised Business.  Absent the timely provision of such notice to Franchisor, Franchisee shall be deemed to conclusively acknowledge that all initial training required to be provided by Franchisor was sufficient and satisfactory in Franchisee's judgment and to have waived any claim against Franchisor for breach of Section IV.A.  For any other Franchisor obligation, Franchisee must give Franchisor a written notice of intent to terminate for cause specifically identifying all defaults and providing that a period of thirty (30) days from the date of notice be allowed for Franchisor to cure any defaults, except that if any default cannot be cured within thirty (30) days, Franchisor shall be given a reasonable time to cure such default as long as Franchisor has initiated steps necessary to cure the default within the thirty (30) day period.  If such material breach by Franchisor is not cured within the thirty (30) day period (or longer period as provided herein), Franchisee may terminate the Agreement with Franchisor for cause.  A termination of this Agreement by Franchisee for any reason other than a material breach of this Agreement by Franchisor and Franchisor's failure to cure such breach within the cure period shall be deemed a termination by Franchisee without cause and a breach of this Agreement.

All Obligations Upon Termination (Section XI of the Franchise Agreement) will be effective and valid upon Franchisee's termination for cause.

## XI.     OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Agreement for any reason or in any manner, Franchisee shall cease to be an authorized HOUSEMASTER franchisee as to any services or products whatsoever, and Franchisee shall:

A.     Immediately discontinue the use of all Proprietary Marks, any names, marks or signs which may be confusingly similar thereto, the HOUSEMASTER Method and Marketing Strategy in their entirety, and all other materials which may indicate that Franchisee is or was an authorized HOUSEMASTER Franchisee or otherwise associated with Franchisor.  Franchisee further agrees to return to Franchisor all supplies and materials containing any reference to Franchisor or the Proprietary Marks, and to cancel any pending advertising and discontinue future advertising, print and online, which refers to or connotes any relationship, whether current or past, between Franchisee and Franchisor.  Franchisee further agrees to immediately discontinue and return to Franchisor any materials created by Franchisee during the term of this

Agreement containing any Proprietary Marks or other proprietary information of Franchisor whether copyrighted or not and whether changed, improved and further developed from time to time by Franchisee.

B.     Promptly pay to Franchisor all sums owing from Franchisee to Franchisor, including any amounts owing under any outstanding loan agreement or promissory note. Termination or expiration of this Agreement under any circumstances shall not relieve Franchisee of any debt, obligation, or liability of Franchisee to Franchisor, which may have accrued hereunder.

C.     Offer, for a period of acceptance of not less than fifteen (15) days, to sell to Franchisor at Franchisee's cost, all or any portion of equipment and supplies suitable for use in connection with the HOUSEMASTER Method, prior to offering the same to any other party.

D.     Assist Franchisor in every way possible to bring about an immediately effective, complete and orderly transfer of Franchisee's HOUSEMASTER building inspection and related services business.  Franchisee specifically agrees hereunder that as between Franchisor and Franchisee, Franchisor has the sole right to and interest in all telephone numbers and directory listings associated with any Proprietary Mark.  Franchisee thus agrees to cooperate fully with Franchisor to assign immediately to Franchisor any and all business telephone numbers used by Franchisee and/or Franchisee's employees in the conduct or promotion of the Franchised Business.  Such cooperation specifically includes that within five (5) days of termination or expiration of this Agreement, Franchisee must notify the telephone company and all directory listing agencies, including those on the Internet, of the termination or expiration of Franchisee's right to use any telephone number and any classified or other telephone directory listing associated with the Proprietary Marks and shall authorize transfer of same to Franchisor or any third party designated by Franchisor.   This Agreement hereby constitutes, authorization to the appropriate telephone company to change and transfer to Franchisor all of Franchisee's rights in and to the use of said business telephone lines, and Franchisee hereby irrevocably appoints and authorizes Franchisor to act as Franchisee's attorney-in-fact and hereby empowers Franchisor to execute such instruments regarding the Proprietary Marks for and in Franchisee's name in order to give full effect to this provision and to effectuate such transfer.  Franchisee shall sign the conditional Assignment of Franchisee's Telephone Numbers attached hereto as Exhibit A upon the execution of this Agreement to assist Franchisor in effecting the assignment of the telephone numbers upon termination of this Agreement.

E.     Take all steps necessary to amend or terminate any state or jurisdictional registration or filing of any d/b/a or assumed name or trade or fictitious name or any other registration or filing containing the Proprietary Marks so as to delete the Proprietary Marks and all references to anything associated with Franchisor's system.

F.     Maintain the confidentiality and not disclose to any person any of the confidential business or trade secrets furnished to Franchisee by Franchisor under this Agreement or in connection with the operation of the Franchised Business.

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

G.      Except as may be required by applicable law, refrain from directly or indirectly representing, identifying or referring to itself, or any of its officers, directors or employees, as currently or formerly trading under the name "HouseMaster" or any other proprietary name or mark of Franchisor, or any name or mark confusingly similar thereto, or of formerly or currently being associated with Franchisor.  This shall include Franchisee's obligation to take affirmative steps to immediately remove all references on the Internet that identify Franchisee and its former business as being associated or affiliated with the HOUSEMASTER System or Franchisor in any way whatsoever, including but not limited to directory listings, contact information or association listings, or on any other website, blog, vlog, social network or other on-line venue or communication on the Internet.

H.      Maintain Errors and Omissions insurance with bodily injury coverage as required by Section V.C. of this Agreement for the longer of three (3) years following the termination or expiration of this Agreement and as long as necessary to protect Franchisor from all liability, actions and claims arising from all inspections and services performed by Franchisee in the operation of the Franchised Business prior to and after the date of termination or expiration of this Agreement.

I.      Immediately turn over to Franchisor all manuals, including the HOUSEMASTER Manuals, proprietary software, lists and data concerning all customers, contacts and real estate service providers (including, but not limited to, names, addresses, telephone numbers and email addresses) records, files, instructions, promotional materials, agreements and any and all other materials provided by Franchisor to Franchisee relating to the operation of the Franchised Business, all of which are acknowledged to be the property of Franchisor.

J.      Immediately discontinue the use of all proprietary software; and to refrain, for a period of eighteen (18) months following the expiration or termination of this Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, from using generic versions of the same software systems as was used with the Franchised Business, including, but not limited to, inspection report writing software and office management software.

K.      All rights and obligations contained in this Agreement that expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement until they are satisfied in full or by their nature expire.

## XII.   COVENANTS NOT TO COMPETE

A.      **Definition.**  Unless otherwise specified, the term "Franchisee" as used in this Section XII. shall include, collectively and individually, all officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee, and of any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; and the general partners and any limited partner (including any corporation and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of securities, or a corporation

which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership.

    **B.**    **Covenants.**  The intention of the parties in the following section is to limit Franchisee's right to compete only to the extent necessary to protect Franchisor from unfair competition. Franchisee covenants that:

    1.    During the term of the Franchise Agreement, Franchisee shall not directly or indirectly divert or attempt to divert any business or customer of the Franchised Business to any competitor of Franchisee or of Franchisor;

    2.    During the term of the Franchise Agreement, and for a period of eighteen (18) months following its expiration or termination for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, Franchisee shall not directly or indirectly solicit or perform services for any customer of any other HOUSEMASTER franchisee or an affiliate of Franchisor, unless said customer has not received service from a HOUSEMASTER franchisee or an affiliate of Franchisor for a period of at least twelve (12) months;

    3.    During the term of the Franchise Agreement, and for a period of eighteen (18) months following expiration or termination for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, Franchisee shall not employ or seek to employ any person employed by Franchisor or by any other HOUSEMASTER franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment;

    4.    During the term of the Franchise Agreement, Franchisee shall not own, maintain, engage in, or have any interest in any business (including any business operated by Franchisee prior to entering into the Franchise Agreement) specializing, in whole or in part, in building inspection and/or related services offering or providing any services or products the same as or similar to those provided or sold through the HOUSEMASTER franchise system;

    5.    For a period of eighteen (18) months following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, and within the geographic areas specified below, Franchisee shall not, either directly or indirectly, for himself/herself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, engage in, franchise, or have any interest in any business specializing, in whole or in part, in building inspection and/or related services offering or providing any services or selling any products the same as or similar to that provided or sold in the HOUSEMASTER franchise system (a) within the ROF Territory described in Section I.A.1 hereunder in which Franchisee's Business is located; (b) within any other geographic area designated by Franchisor as a ROF Territory in which HOUSEMASTER franchisees are currently operating; and (c) within a radius of twenty-five (25) miles of the Limited Area granted to any other HOUSEMASTER Business, whether franchised or owned by Franchisor or any affiliate of Franchisor.

6.      For a period of three (3) years following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business pursuant to this Agreement, whichever is later, Franchisee shall not, directly or indirectly, solicit or perform services for any customer for whom Franchisee performed services while he/she was a HOUSEMASTER franchisee.

7.      For a period of three (3) years following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business pursuant to this Agreement, whichever is later, Franchisee must cease any and all associations for business purposes with any contacts or real estate service providers that were established while a HOUSEMASTER Franchisee in connection with the Franchised Business.

8.      Franchisee expressly acknowledges that he/she possesses marketable skills and abilities of a general nature outside the scope of the Franchised Business and building inspection and/or related services, and has other opportunities to exploit such skills. Consequently, enforcement of the covenants set forth above will not deprive Franchisee of the ability to earn a living.

C.      **Enforcement of Covenants.**   The foregoing covenants shall be construed independently of any other covenant or provision in the Franchise Agreement. The parties hereby expressly agree that if the scope of enforceability of the provision is disputed at any time by Franchisee, a court or arbitrator, as the case may be, may modify this section to the extent that it deems necessary to make such provision enforceable under applicable law.  If all or any portion of a covenant is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee shall be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated and made a part of the Franchise Agreement.  In the event that Franchisee engages in the activities prohibited in this Section XII in violation of said covenant, said eighteen (18) month period of non-competition shall extend beyond the eighteen (18) month anniversary date of termination or expiration of this Agreement for a period of time equal to the duration of Franchisee's violation of said covenant, but only to the extent necessary to insure that Franchisee refrains from competition for a full eighteen (18) month period and not longer.  In the event Franchisor seeks an injunction in court to enforce the covenant not to compete, the time period during which competition is restrained shall not begin to run until the earlier of: (1) the date Franchisor obtains said injunction, or (2) the date Franchisee begins to comply with the covenant not to compete.

In the event Franchisee violates the foregoing covenants, in addition to liquidated damages to which Franchisor shall be entitled, Franchisee also agrees to pay a fine in the amount of Twenty-Five Thousand Dollars ($25,000.00) or twenty percent (20%) of Franchisee's annual Gross Sales as calculated from the average of the preceding three (3) years, whichever is greater.

In the event that the covenant not to compete is unenforceable in Franchisee's jurisdiction and Franchisee continues to provide building inspection services after the termination or

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

expiration of this Agreement, Franchisee hereby agrees to assume the obligation to pay Franchisor the greater of (i) thirty percent (30%) of Gross Sales for all building inspection services conducted for a period of one (1) year prior to the termination or expiration of this Agreement or (ii) Fifty-Two Thousand Five Hundred Dollars ($52,500.00) plus the cost of NIBI training (for all personnel who attended). Franchisee acknowledges that the training received in the HOUSEMASTER Method and Marketing Strategy and technical training has an inherent value for which Franchisee has made no payment. The parties have agreed that Franchisee shall not utilize the training received, directly or indirectly, with any other person or entity or for its own enterprise within a radius of twenty-five (25) miles of the ROF Territory described in Section I.A.1 and as otherwise prohibited by Section XII.B.5 herein without payment to Franchisor as outlined above. Further, the parties have determined that such agreement would not be prohibited or void under applicable state law because its only objective is to postpone the payment for training indefinitely, until such a time as Franchisee uses the training for other than the operation of the Franchised Business.

D.      **Covenants to Be Signed by Other Employees**. Franchisor reserves the right to require Franchisee's managers, field sales personnel, inspectors and all other personnel receiving training from Franchisor to execute similar covenants in a form satisfactory to Franchisor.

E.      **Modifications of Covenants**. Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant or obligation of Franchisee set forth in the Franchise Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee shall comply with any covenant as so modified, which shall be fully enforceable.

## XIII.   DISPUTE RESOLUTION

A.      **Arbitration.** Except to the extent Franchisor elects to enforce the provisions of this Agreement by judicial process as provided herein, any controversy, dispute, claim or question arising out of, in connection with, or in relation to this Agreement or its interpretation, performance, or any breach thereof, which cannot be settled amicably between the parties shall be determined solely and exclusively by arbitration with venue in the State of New Jersey and shall be heard by one arbitrator in accordance with the then existing commercial Rules of the American Arbitration Association ("Rules"). Franchisor and Franchisee agree that arbitration shall be conducted on an individual, not a class-wide basis, and that an arbitration proceeding involving Franchisor and Franchisee shall not be consolidated with any other arbitration proceeding involving Franchisor and any non-party to this Agreement, including other franchisees. Judgment upon any award, which may include an award of damages, may be entered in the Superior Court of the State of New Jersey, in the court of any jurisdiction in which Franchisee is located, or in any other court having jurisdiction thereof.

This arbitration provision is self-executing. For greater clarity, the above-noted Rules apply, and the arbitration may proceed, and the arbitrator has jurisdiction, regardless of whether any party fails to actively participate or appear. In the event that any party fails without good cause (i) to appear at any properly noticed arbitration proceeding; or (ii) to make payment in full of its share of the required arbitration fees and costs within ten (10) days after notice and demand, absent a previously

issued court order to the contrary, then the arbitrator or the organization/entity administering the arbitration shall be authorized to enter a final award against such party, notwithstanding the failure to appear or to make the required payment.

B.   **Exceptions to Arbitration.**   Notwithstanding Section XIII.A of this Agreement:

1.   If the amount in controversy exceeds Fifty Thousand Dollars ($50,000.00) in the aggregate, Franchisor shall have the right to: (1) require that the matter (including any related or ancillary issues) be heard by a panel of three (3) arbitrators instead of one (1) arbitrator, or (2) require that the matter (including any related or ancillary issues) be heard before the Superior Court of New Jersey, Law Division, Somerset County, in lieu of arbitration.  If any arbitration demand has been filed, Franchisor shall have the right to remove the matter (including any related or ancillary issues) to any such court.

2.   Nothing contained herein shall in any way deprive Franchisor of its right to seek injunctive and other equitable relief against Franchisee in any court of competent jurisdiction located in the State of New Jersey to enforce the provisions of Sections VI, VII, X, XI and XII of this Agreement without in each case having to post any bond or security.

3.   If Franchisee fails to make any payment of money owed to Franchisor when due, or fails to submit to Franchisor when due any report required pursuant to this Agreement, and such default is not fully cured within fifteen (15) days after Franchisor gives notice of such default, Franchisor may initiate arbitration or may commence other legal proceedings as provided herein to recoup the outstanding debt.  In the event Franchisee has failed to submit timely reports upon which the outstanding debt can be properly calculated, Franchisor may calculate amounts due based on Franchisee's average monthly Gross Sales as determined by the preceding eighteen (18) months.  In the event Franchisor chooses to utilize this aforementioned remedy, it in no way waives the right to terminate this Agreement.

The parties hereby consent to the exclusive jurisdiction of such arbitral tribunals and courts as aforesaid and waive all questions of personal jurisdiction or venue for the purposes of this Agreement.  The parties' consent to personal jurisdiction and venue continues in full force and effect subsequent to the expiration or termination of this Agreement.

4.   Franchisor and Franchisee further agree that any litigation arising out of a dispute relating to this Agreement is only a matter between Franchisor and Franchisee and no other franchisees.  Franchisee agrees not to join or attempt to join other franchisees or any other non-party to this Agreement.

C.   **Governing Law/Consent to Jurisdiction.**   All matters relating to arbitration shall be governed by the Federal Arbitration Act (9 U.S.C. Section 1 et. seq.).  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et. seq.) or other federal law, this Agreement and franchise shall be governed by the laws of the State of New Jersey except to the extent that the law of the state in which the Franchised Business is located requires that it be governed by the laws of such state.  To the extent any claim shall not be arbitrated as provided in Section XIII.B, Franchisee irrevocably submits to the

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

exclusive jurisdiction of any state or federal court of jurisdiction located in the State of New Jersey and waives any objection he may have to either the jurisdiction or venue of such court.

      **D.**    **Cost of Enforcement or Defense.** If a claim for amounts owed by Franchisee to Franchisor is asserted in any arbitration or judicial proceeding or appeal thereof, or if Franchisor or Franchisee is required to enforce this Agreement in an arbitration or judicial proceeding or appeal thereof, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accounting and attorneys' fees (whether such fees be incurred by outside counsel or a staff attorney), arbitration administrative charges, arbitrator's compensation, and any other costs and expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any written demand, claim, action, hearing or proceeding to enforce the obligations of this Agreement. If Franchisor incurs expenses in connection with Franchisee's failure to pay when due amounts owing to Franchisor; to submit when due any reports, information or supporting records; failure to comply with post-termination obligations, including the covenant not to compete; or any other failure to comply with this Agreement, Franchisee shall reimburse Franchisor for any such costs and expenses which it incurs including but not limited to attorneys' and accounting fees. Further, all outstanding amounts due to Franchisor shall, at Franchisor's election, be assessed a penalty of Ten dollars ($10.00) per day or accrue interest at a per annum rate of eight percent (8%).

      **E.**    **WAIVER OF JURY TRIAL. EACH PARTY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.**

      **F.**    **Limitation of Damages.** Except as explicitly provided in this Agreement, for any claim concerning performance or non-performance by either party pursuant to, or in any way related to the subject matter of this Agreement, any party's sole liability, if any, shall be limited by actual damages. For any claim that arises out of or in connection with this Agreement, whether such claim is in contract, tort or otherwise, except as otherwise explicitly provided herein, under no circumstances shall either party be liable for indirect, exemplary, incidental, consequential, aggravated or punitive damages, including, but not limited to, loss of anticipated income, profits or savings, or loss resulting from business interruption.

      **G.**    **Limitation of Claims.** Except for claims against Franchisee concerning the underreporting of Gross Sales, for non-payment of any fee due under this Agreement, intellectual property infringement/violations, claims for violation of post-termination obligations, including, but not limited to, a breach of the covenant not to compete, and for claims against Franchisee by Franchisor relating to third party claims or suits brought against Franchisor as a result of Franchisee's operation of the Franchised Business, any and all claims arising out of or relating to this Agreement or the relationship between or among the parties hereto shall be barred unless an arbitration or legal proceeding is commenced within one (1) year from the date Franchisee or Franchisor knew or should have known of the facts giving rise to such claims.

      **H.**    **Liquidated Damages.** Because any actual or direct damages associated with Franchisee's improper disclosure of proprietary information and/or breach of the non-competition covenants (contained herein at Section XII) are necessarily uncertain and/or difficult

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

to ascertain, in the event of such a contractual breach, Franchisee hereby agrees that Franchisor is entitled to recover as liquidated damages the greater amount of either: (i) thirty percent (30%) of Franchisee's annual Gross Sales from the preceding year; or (ii) the cost of NIBI training (for all personnel who attended) plus Fifty-Two Thousand Five Hundred Dollars ($52,500.00), the value Franchisee received for no charge in consideration for abiding by the terms of the Agreement, including the benefit of the HOUSEMASTER Initial Training Program, training materials, and the licensing of certain HOUSEMASTER proprietary computer software.

## XIV.   MISCELLANEOUS

A.   **Grammar.**  Any personal pronoun shall include the masculine, feminine and/or neuter thereof, and the singular of any noun or pronoun shall include the plural and plural the singular, wherever the context may require.

B.   **Section Headings.**  Section headings are for ease of reference only.  They are not a part of this Agreement and shall not limit or define the meaning of any provision.

C.   **Non-waiver.**  No custom, usage or practice with regard to this Agreement by Franchisee or Franchisor's other franchisees shall preclude Franchisor's strict enforcement of this Agreement in accordance with its literal terms.  No waiver by Franchisor of performance of any provision of this Agreement shall constitute or be implied as a waiver of Franchisor's right to enforce that provision at any future time.  As such, no failure by Franchisor to take action on account of any default by Franchisee, whether in a single instance or repeatedly, shall constitute a waiver of any such default or of the performance required of Franchisee.

D.   **Invalidity.**  If any provision of this Agreement shall be invalid or unenforceable, either in its entirety or partially or because of its application to particular circumstances, such provision shall, by mutual intention herein expressed by the parties hereto, be deemed modified to the extent necessary to render such provision valid or applicable, or to be eliminated from this Agreement, if required, and this Agreement shall be construed and enforced as if such provision had been originally so modified or eliminated.  In the event that total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section shall apply only to the extent that the laws of such jurisdiction are controlling.

E.   **Entire Agreement.**  This Agreement constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and it may be modified only by a written document executed by the party sought to be bound or obligated. The parties acknowledge hereby that there are no representations, understandings, agreements, terms or conditions not contained or referred to in this Agreement, and that this Agreement supersedes any prior written or oral agreements, representations or inducements, between or among the parties hereto, except for the information contained in Franchisor's Franchise Disclosure Document.

F.    **Franchise   Relationship;   Independent   Business   Owner/Contractor.** Franchisee and Franchisor are independent of each other.  This Agreement does not create the relationship of principal and agent, joint ventures or partners between Franchisor and Franchisee, and in no circumstances shall Franchisee be considered an agent of Franchisor.  As described in Section V.B.5 herein, Franchisee agrees that it will do nothing to give the impression that it is an agent of Franchisor or to attempt to create any obligation on behalf of or in the name of Franchisor.  Neither party has any involvement in the hiring, firing or supervising of each other's employees.   Franchisee shall hold himself out to the public to be an independent business owner/contractor operating the Franchised Business pursuant to a franchise from Franchisor. Franchisee agrees to take such actions as are necessary in the opinion of Franchisor to accomplish this, including but not limited to, exhibiting a notice of the fact on stationery, forms, and promotional materials of the Franchised Business, the content and form of which Franchisor reserves the right to specify or approve.  In furtherance thereof, as described in Section VI.B. herein, Franchisee's Firm Name must be exclusively used on all inspection order agreements and inspection reports.

G.    **Counterparts.**  This Agreement may be executed in any number of identical counterparts, and each such counterpart shall be deemed a duplicate original hereof.

H.    **No Third Party Beneficiary.**  The rights and obligations in this Agreement are intended for the benefit and burden of the signatories only.  Under no circumstances are any third-party beneficiaries intended or otherwise contemplated by any provision herein.

I.    **Notices.**  Any notice required or permitted under this Agreement shall be in writing and either delivered in person, via facsimile with receipt confirmation, e-mailed with receipt confirmation, or mailed, return receipt requested or commercial overnight delivery, postage fully prepaid and addressed as follows:

1.    If to Franchisee, either to the address of the Franchised Business as set forth heretofore or to Franchisee's residence address; and,

2.    If to Franchisor, the address of its principal offices as heretofore set forth.

3.    Addresses for notices may be changed at any time upon written notice thereof.

Franchisee is obligated to update Franchisor in writing as to any change in contact information, including, but not limited to, address, telephone number, e-mail, fax, etcetera. If Franchisee fails to do so,, notice shall be deemed effective upon distribution to last known contact information of record.

## XV.    ACKNOWLEDGMENTS BY FRANCHISEE

A.    **Independent Investigation.**  Franchisee acknowledges that he has conducted an independent investigation of the HOUSEMASTER Business franchised hereunder and the ROF Territory in which Franchisee intends to operate the Franchised Business.  Franchisee recognizes

that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent business person and the market forces of the market in which the Franchised Business is located. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received nor relied upon any warranty or guaranty, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

**B.** **Receipt and Review of Documents**. Franchisee acknowledges that he has received a copy of this Agreement at least seven (7) calendar days prior to the date on which this Agreement was executed and a Franchise Disclosure Document at least fourteen (14) calendar days prior to the date on which this Agreement was executed and the date of payment of any consideration by or on behalf of Franchisee to Franchisor or any of Franchisor's affiliates, relating to the Franchises Business. Franchisee acknowledges that it has read and understands this Agreement and that Franchisor has fully and adequately explained the provisions of it to Franchisee's satisfaction and that Franchisor has accorded Franchisee ample time and opportunity to consult with legal counsel and/or other advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**C.** **Anti-Terrorism Laws**. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents and warrants that none of the property or interests of Franchisee is subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee is not otherwise in violation of any of the Anti-Terrorism Laws. For purpose of this paragraph, "Anti-Terrorism Laws" means Executive Order 13244 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any Governmental Authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorists acts and acts of war.

Franchisee certifies that none of Franchisee's owners, employees, or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. (The Annex is available at http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html.) Franchisee agrees not to hire any individuals listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, employees, or anyone associated with Franchisee to be listed in the Annex to Executive Order 13224. Franchisee shall be solely responsible for ascertaining what actions must be taken by Franchisee to comply with the Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities set forth in this Agreement pertain to Franchisee's obligations under this Section.

Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners or employees shall constitute grounds for

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

immediate termination of this Agreement and any other agreement Franchisee has with Franchisor or an affiliate of Franchisor, in accordance with the terms of Section X.A. of this Agreement.

In Witness Whereof, Franchisee and Franchisor have executed this Agreement on the date or dates hereinafter written.

THIS AGREEMENT IS NOT EFFECTIVE UNLESS AND UNTIL ACCEPTED BY FRANCHISOR, AS EVIDENCED BY DATING AND SIGNATURE BY AN AUTHORIZED OFFICER OF FRANCHISOR.

**FRANCHISEE:**

William Basch

_____
(Signature)

Date: ___1/30/2010___

Full Name (printed): William Basch

_____

Witness of Above

Address and phone number of Franchisee's residence:

442 Bedford Ave
Brooklyn NY 11211

**FRANCHISOR:**

DBR FRANCHISING, LLC
A Delaware Limited Liability Company

By: _____

___CFO___
Title

Date: ___3/3/10___

**EXHIBIT A TO FRANCHISE AGREEMENT**
**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S**
**TELEPHONE NUMBERS**

Franchisee (Assignor):William Basch, whose business address is 3 Walton Street, Brooklyn, NY 11206, in consideration of the granting of a franchise to Assignor contemporaneously herewith, and other valuable consideration paid by DBR Franchising, LLC (Franchisor/Assignee), having its principal place of business at 426 Vosseller Avenue, Bound Brook, New Jersey, 08805, hereby assigns unto the Assignee all telephone numbers and listings utilized by Assignor in the operation of its HOUSEMASTER business at Assignor's address above-referenced. Assignor acknowledges that HouseMaster® and associated marks are solely the property of Franchisor/Assignee.  As such, Assignor's right to use any telephone numbers and directory listings associated with the HouseMaster® trademarks and service marks was solely due to a limited license granted by Assignee/Franchisor in connection with the Assignee/Franchisor's trademark(s)/service mark(s).  Since said license has expired and/or terminated, Assignor has no right to the telephone number or directory listing associated with the Assignee/Franchisor's trademark, including, but not limited to HouseMaster.®

This Assignment shall constitute authorization to the appropriate telephone company to change and transfer to Franchisor/Assignee all of Assignor's rights in and to the use of said business telephone lines and Assignor hereby irrevocably appoints and authorizes Franchisor/Assignee to act as Assignor's attorney-in-fact and hereby empowers Franchisor/Assignee to execute such instruments in the Assignee's name in order to give full effect to this Assignment and to effectuate any transfer.

The Assignee hereby assumes the performance of all of the terms, covenants and conditions of the Telephone company with respect to such telephones, telephone numbers and telephone listings with the full force and effect as if the Assignee has been originally issued such telephones, telephone numbers, telephone listings and the usage thereof.

**ASSIGNOR (Franchisee):**                    **ASSIGNEE (Franchisor):**

William Basch                                DBR FRANCHISING, LLC

By: _____            By: _____

Its: _____            Its: _____cfo_____

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

**EXHIBIT B TO FRANCHISE AGREEMENT**
**CONSENT AGREEMENT FOR CHARGE CARD AUTHORIZATION**

Franchisee <u>William Basch</u>, whose business address is <u>3 Walton Street, Brooklyn, NY  11206</u>, hereby consents and permits Franchisor to charge ANY AND ALL fees which become due and payable under the terms and conditions of this Franchise Agreement (including but not limited to royalty-service fees, advertising-promotion contributions, Conference Registration Fees, material purchases, insurance premiums, claims, deductibles and late penalties and interest) to the credit card listed below.

This authorization is irrevocable and shall remain in effect for so long as the Franchise Agreement remains in effect.

In the event the credit card listed below expires or becomes unusable for any reason, Franchisee will supply Franchisor with updated valid credit card information.  This new credit card will be subject to this authorization as if it had been in effect at the time this Agreement was signed.

**CREDIT CARD INFORMATION:**

Card Type (Circle One):

AMEX          VISA          MASTERCARD          DISCOVER

Card Number: _____

Expiration Date: _____

Security Code (If any): _____

**FRANCHISEE:**                          **FRANCHISOR:**

William Basch                            DBR FRANCHISING, LLC

By: _____              By: _____

Date: _____              Date: _____

## EXHIBIT C TO FRANCHISE AGREEMENT

# HouseMaster®

*Home Inspections. Done Right.®*

### Electronic Funds Transfer Authorization Form

I,    William    Basch    ("Franchisee"),   whose   business   name   is
_____, hereby consent and permit DBR
Franchising, LLC ("Franchisor") to debit ANY AND ALL fees which become due and payable
under the terms and conditions of my Franchise Agreement(s) (including but not limited to
royalty-service fees*, advertising-promotion contributions*, conference registration fees,
material purchases, late penalties and/or fines) from the bank account listed below.

| BANK ACCOUNT INFORMATION | |
| --- | --- |
| Bank Name: _____ | Account Type: ☐ Business  ☐ Personal |
| Bank City: _____ | Account Type: ☐ Checking  ☐ Savings |
| Bank State or Province: _____ | |
| Account Number: _____ | Bank Routing #: _____ |
| Please include a void check from this account when submitting this form. | |

*In regards to royalty-service fees and advertising-promotion contributions, if Franchisee has not
submitted the required Recap Sheet for a specific month in a timely fashion (by the 10th day of
the following month) Franchisee hereby permits Franchisor to debit royalty-service fees and
advertising-promotion contributions in the amount of the last submitted Recap Sheet or the
Franchisee's specific monthly royalty-service fee minimum, whichever is greater. Once said
delinquent Recap Sheet has been received an adjustment will be made to the amount charged.
Applicable late fees of $10 per day will continue to accrue until such time Recap Sheet has been
received by Franchisor and will be included in the adjustment. Regardless of whether the actual
Recap Sheet has been received, Franchisor agrees to debit these monies no sooner than the 10th
day of the following month (or the next business day if the 10th falls on a weekend).

It is expressly understood and agreed that Franchisee shall be responsible for a per occurrence
fee of Forty Dollars ($40.00) should any debit be rejected by the above referenced bank account
for any reason.

This Authorization is irrevocable and shall remain in effect for so long as the Franchise
Agreement remains in effect. In the event the bank account listed above is closed or becomes
unusable for any reason, Franchisee agrees to notify Franchisor in writing of any changes to bank
account information at least fifteen (15) days prior to the next due date of charges.  This new
bank account will be subject to this Authorization as if it had been in effect at the time this
Agreement was signed.

In Witness Whereof, Franchisee and Franchisor have executed this Electronic Funds Transfer Authorization Form on the date or dates hereinafter written.

**FRANCHISEE:**
William Basch

**FRANCHISOR:**
DBR FRANCHISING, LLC

By: _____

By: _____

Date: _____

Date: _____

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

**EXHIBIT D**
**ADDENDUM TO FRANCHISE AGREEMENT**
**FOR LIMITED AREA FRANCHISE**

This Addendum to Franchise Agreement for a Limited Area Franchise is entered into by and between DBR FRANCHISING, LLC with an address of 426 Vosseller Avenue, Bound Brook, New Jersey, 08805 ("Franchisor") and William Basch, with an address of 3 Walton Street, Brooklyn, NY 11206 (Franchisee").

WHEREAS, certain limited circumstances may warrant the grant of a Limited Area Franchise and Franchisee desires to license such a franchise.

WHEREAS, Franchisor and Franchisee have contemporaneously herewith entered into a Franchise Agreement and desire to amend certain terms of the Franchise Agreement to convert the grant of the Reciprocal Opportunity Franchise to a Limited Area Franchise.

NOW THEREFORE, in consideration of the good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Notwithstanding anything to the contrary in the Agreement, in the event of a conflict between the provisions of the Franchise Agreement and the provisions of this Addendum, the provisions of this Addendum shall control. The parties agree that the Franchise Agreement remains fully effective in all respects except as specifically modified herein, and all the respective rights and obligations of the Franchisee and Franchisor remain as written unless modified herein.

2.  Subparagraph 1 of Section I.A of the Franchise Agreement is hereby amended by deleting the text and inserting, in its entirety, the following:

    1.  To use the HOUSEMASTER Method, HOUSEMASTER Marketing Strategy and Proprietary Marks as defined in Section VI. below in connection with the operation of the Franchised Business at a location within the following geographical area ("the Limited Area") Richmond County, New York. Should the Limited Area be described in postal codes and should the boundaries of any such postal codes change for any reason, the Limited Area shall be deemed to be the same geographic boundaries as those designated for those postal codes on the effective date of this Agreement. Upon request, permission to move to a new location or to open additional locations in the Limited Area will not be unreasonably withheld by Franchisor. Franchisor shall not franchise any other party or parties to establish and operate a building inspection and related services business using Franchisor's names and marks at any location within the Limited Area.

3.   Subparagraph 2 of Section I.A of the Franchise Agreement is hereby amended in part by replacing the words "Reciprocal Opportunity Franchise Territory" with "Limited Area."

4.   Subparagraph 4 of Section I.A of the Franchise Agreement is hereby amended by deleting the text and inserting, in its entirety, the following:

> 4.     The Limited Area granted under this Agreement is protected. Franchisee is prohibited from marketing, advertising, or soliciting customers, or maintaining a presence in any other way in an area licensed to another HOUSEMASTER franchisee.  Franchisee is not allowed to conduct inspections or market in another franchisee's Limited Area except as described herein.  If Franchisee desires to conduct an inspection in another franchisee's Limited Area, Franchisee must obtain the other franchisee's written consent prior to conducting the inspection.  In no event may Franchisee conduct an inspection in an area designated by Franchisor as a Reciprocal Opportunity Franchise Territory. Conducting an inspection in another HOUSEMASTER franchisee's Limited Area without obtaining the applicable franchisee's written permission, conducting an inspection in a Reciprocal Opportunity Franchise Territory, or engaging in any marketing, advertising or solicitation of customers prohibited by this Agreement will result in a fine of $1,000 per occurrence payable to Franchisor, due upon demand.  This penalty is in addition to, not in lieu of, Franchisor's right to terminate Franchisee for said conduct.

> If Franchisee conducts an inspection in a geographic area that has not been granted to another HOUSEMASTER franchisee, no consent is required and no penalty will be assessed.  However, if such an area is later licensed to a HOUSEMASTER franchisee (whether designated as a Reciprocal Opportunity Franchise or granted as a Limited Area), the necessity to obtain written consent (in the case of a Limited Area) and the cross-territory fine would be enforceable from the date of the grant of the franchise forward.  Under no circumstances may Franchisee engage in marketing activities in any open area.  Further, if Franchisor receives a complaint regarding a franchisee crossing territories, any confidentiality that may attach to records, reports or forms pursuant to Section II.B. (6.) contained herein is deemed waived by Franchisee.

5.   Section I.A. of the Franchise Agreement shall be amended in part by inserting the following:

> 6.     Franchisee shall generate Gross Sales (as such term is defined at Section II.A.) of no less than $72,981 by the end of the first year of operation.

DBR.FA 0309

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

6.  Section I.C. of the Franchise Agreement is hereby amended in part by the addition of the following:

> 8.  Franchisee, either in the year immediately preceding the expiration date of the initial franchise term granted herein, or on an annual basis averaged over the last three (3) years preceding the expiration date of the initial franchise term granted herein, has made gross annual sales subject to royalty payments paid to Franchisor of no less than $106,850;

7.  The sum of the Initial Franchise Fee to be inserted at Section I.D. of the Franchise Agreement is Zero ($0) Dollars - RENEWAL.

8.  Section I.E. of the Franchise Agreement is hereby amended in part by replacing "ROF Territory" with "Limited Area."

9.  The minimum monthly royalty fee to be inserted at Section II.A.1 of the Franchise Agreement is Five Hundred ($500) Dollars.

10. Subparagraph B. of Section III. of the Franchise Agreement is hereby amended in its entirety as follows:

> **B.  Approval of Local Advertising.**  Franchisee may in its own right and at its own expense advertise and promote HOUSEMASTER services, provided that all such advertising and promotional materials proposed to be used shall prior to use or publication be submitted to and approved in writing by Franchisor in the interest of maintaining the integrity, force, quality, image, and goodwill associated with the proprietary names and marks of Franchisor.  On all advertising and promotional materials, Franchisee must designate the licensed geographic Limited Area that is being serviced by Franchisee in a manner approved by Franchisor.  All advertising and promotions by Franchisee shall be completely accurate and truthful, shall conform to all applicable laws and regulations relating to consumer advertising, and shall give notice that Franchisee's building inspection business is an independently owned and operated HOUSEMASTER franchise.  Franchisee shall indemnify and hold Franchisor harmless for Franchisee's violation of this paragraph. All such advertising and promotional materials prepared, developed or used by Franchisee in connection with the Franchised Business (whether or not approved by Franchisor as required) shall become Franchisor's sole and exclusive property.

11. Subparagraph 6 of Section V.B. of the Franchise Agreement is hereby amended in part by replacing "ROF Territory" with "Limited Area."

12. Subparagraph 10. of Section V.B. of the Franchise Agreement is hereby amended in its entirety as follows:

HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • HouseMaster • **HouseMaster** • HouseMaster • HouseMaster • HouseMaster

10.    Franchisee shall have a minimum of one (1) dedicated telephone line for use exclusively by the Franchised Business.  Said line shall be operational and functioning throughout the term of this Agreement.  Any directory listing (i.e., Yellow and White Pages) associated with the dedicated line must be advertised and distributed in Franchisee's Limited Area.   All advertising and promotional materials that may cross into another Franchisee's area (due to geographic area compilation of the particular directory only) must designate the Limited Area that is being serviced by Franchisee.

13.    Section X.A. of the Franchise Agreement shall be amended in part by the addition of the following:

19.    Franchisee fails to attain annual Gross Sales of no less than $72,981 by the end of the first year of operation;

14.    Subparagraph 5 of Section XII.B of the Franchise Agreement is hereby amended by deleting the text and inserting, in its entirety, the following:

5.    For a period of eighteen (18) months following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, and within the geographic area specified below, Franchisee shall not, either directly or indirectly, for himself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, engage in, franchise, or have any interest in any business specializing, in whole or in part, in building inspection and/or related services offering or providing any services or selling any products the same as or similar to that provided or sold in the HOUSEMASTER franchise system (a) within a radius of twenty-five (25) miles of the Limited Area described in Section I.A.1 hereunder; (b) within a radius of twenty-five (25) miles of the Limited Area granted to any other HOUSEMASTER business, which is in existence on the date of expiration or termination of this Agreement, whether franchised or owned by Franchisor or an affiliate of Franchisor; and (c) within any geographic area designated by Franchisor as a Reciprocal Opportunity Franchise Territory in which HOUSEMASTER franchisees are operating as of the date of expiration or termination of this Agreement.

In Witness Whereof, Franchisee and Franchisor have executed this Addendum on this
_____ day of _____, 20_____.

**FRANCHISEE:**
William Basch

_____
(Signature)

Date: ___1/30/2010___

**FRANCHISOR:**
DBR FRANCHISING, LLC
A Delaware Limited Liability Company

By: _____

Title: ___CFO___

Date: ___3/3/10___

Full Name (printed):  William Basch

_____
Witness of Above

**EXHIBIT E**
**DBR FRANCHISING, LLC**
**ADDENDUM TO THE FRANCHISE AGREEMENT**
**FOR THE STATE OF NEW YORK**


This Addendum is to a Franchise Agreement dated <u>September 1, 2009</u> between DBR FRANCHISING, LLC and <u>William Basch</u> (Franchisee) to amend said Agreement as follows:

1.   Section I.C. of the Franchise Agreement on "Renewal" and Section VIII.A. of the Franchise Agreement on "Assignment of Franchise Rights" are amended by the addition of the following language to the original language that appears therein:

>        "All rights enjoyed by the Franchisee and any causes of action arising in its favor from the provisions of Article 33 of the General Business law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of GBL Section 687.4 and 687.5 be satisfied."

2.   Section XIII.C. of the Franchise Agreement on "Governing Law/Consent to Jurisdiction" shall be amended by the addition of the following language to the original language that appears therein:

>        "The foregoing choice of law shall not be considered a waiver of any right conferred upon the Franchisee by the provisions of Article 33 of the General Business Law of the State of New York."

3.   Section IX of the Franchise Agreement on "Assignability by Franchisor" shall be amended by the addition of the following language to the original language that appears herein:

>        "However, Franchisor shall not assign its rights and obligations to a transferee unless in its reasonable judgment, the transferee is able to fulfill the Franchisor's obligations under its franchise agreements."

**IN WITNESS WHEREOF**, each of the undersigned hereby acknowledges having read this Addendum, understands and consents to be bound by all of its terms, and agrees it shall become effective this 1st day September, 2009.

**FRANCHISEE:**
William Basch

_____
(Signature)

Date: ___1/30/2010___

Full Name (printed): William Basch

_____
Witness Above

Address and phone number of
Franchisee's residence:

_____

_____

**FRANCHISOR:**
DBR FRANCHISING, LLC
A Delaware Limited Liability Company

By: _____

Title: ___CFO___

Date: ___3/3/10___