# Exhibit D

**BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED;
(COPY BY REGULAR MAIL AND EMAIL ATTACHMENT)**

December 3, 2015

William Basch
Dependable Inspection Enterprises, Inc.
3 Walton Street
Brooklyn, New York 11206

    **Re: Notice of Default**

Mr. Basch:

I represent HouseMaster, LLC ("HouseMaster"), formerly known as "DBR Franchising, LLC." This letter relates to your September 2009 HouseMaser™ franchise agreement (the "Franchise Agreement") for your home inspection operations in Richmond County, New York. Enclosed with this letter is a notice of default related to the Franchise Agreement.

You have violated the Franchise Agreement for failure to make royalty service fees and marketing contribution payments to HouseMaster for past months. Your current outstanding balance is **$11,140.14**, including estimates for unreported September and October information. You have no legal or contractual right to withhold payment. Enclosed is a report outlining the past-due payments. Please promptly deliver full payment to HouseMaster.

HouseMaster has also been made aware that you own and operate the www.Masterinspectionservices.com website. Enclosed is a snapshot of one of its webpages. This website advertises the same home inspection services as your HouseMaster™ franchised business and employs your name and the telephone number for your franchised business. This is a substantial and material violation of your Franchise Agreement. This competing website and business and unauthorized use of the franchised business' telephone number and the HouseMaster's methods, trade secrets, and confidential and proprietary information materially and substantially harms the HouseMaster™ system and our franchisees.

Further, your use of the following logo violates HouseMaster's trademark rights:



HouseMaster is the owner of the "HouseMaster" names and marks, including without limitation the federal trademark registration numbers 1515093, 1960067, 1970471, 2845309, 3085974, 1850656, and 1844346. HouseMaster and its franchisees, affiliates and predecessor have used the "HouseMaster" names and marks since at least as early as 1979. By virtue of being the senior user of these marks, HouseMaster also has common law rights in its "HouseMaster" names and marks.

As you well know, HouseMaster's mark registrations are still active and HouseMaster and its network of franchisees continue to actively use the HouseMaster and marks. HouseMaster and its predecessors, partners, affiliates, and franchisees have expended significant sums to promote home inspection services and related home products and services that are provided

1

under the HouseMaster names and marks in the state of New York, throughout the United States, and internationally. As a result of these promotional efforts and sales of HouseMaster products and services, the HouseMaster names and marks have acquired a valuable reputation among the consuming public.

Your use of the above-referenced logo employs the image of a "house" with the word "master." It also employs the exact same font as the HouseMaster™ franchise system's primary logo. This confuses the public and causes customers to believe that your www.Masterinspectionservices.com website and the related services and business originating therefrom are affiliated or connected with, or sponsored or approved by HouseMaster and its partners, affiliates, or franchisees. Your continued use of this site and logo constitutes trademark infringement, unfair competition, an unfair and deceptive trade practice, and dilution under federal, state, and common law. Pursuant to the provisions of the Lanham Act and other related laws, HouseMaster and its affiliates are entitled to an award of damages from your unauthorized use of the website and logo and the confusion and misunderstanding created by your use and an award of the costs and attorneys' fees incurred by HouseMaster or its affiliates in enforcing their rights. In trademark litigation, only the likelihood of confusion is needed to establish trademark infringement.

**DBR DEMANDS THAT YOU IMMEDIATELY CEASE INFRINGING UPON ITS AND ITS AFFILIATES' TRADEMARKS AND NAMES.**

This letter and this notice are sent with complete reservation of all rights. Any defaults or claims not mentioned are not waived. All penalties or other fees and charges owed are not waived. If you have any questions or would like to discuss a payment or workout plan, please contact HouseMaster as soon as possible. We look forward to your prompt reply to this matter.

    Sincerely,
    **FranchiseSmith Utah, LLC**


    Bradley D. Smith,
    Attorney at Law

cc:    HOUSEMASTER, LLC

Bradley D. Smith
FranchiseSmith Utah, LLC
5508 W. Kensington Cir.
Highland, UT 84003
(801)615-1564
brad@franchisesmith.com

# HOUSEMASTER, LLC

## DEFAULT NOTICE:
## Notice of Default and 15-Day Right to Cure

Date:    December 3, 2015

To:      William Basch ("you")

FROM:    HouseMaster, LLC ("us" or "we")

This Default Notice relates to your HouseMaster™ franchise agreement (the "Franchise Agreement") for your home inspection business operations in Staten Island, New York.

**<u>Royalty and Marketing Contributions</u>**
Sections II(A) and (B) and III(A) of the Franchise Agreement state, in relevant part:

**II(A). Amount and Payment of Periodic Fees.**

       1.     In further consideration of the rights and entitlements granted under this Agreement, Franchisee agrees to pay to Franchisor on or before the 10th day of the month for the preceding calendar month, throughout the term of this Agreement, the greater of the minimum monthly royalty service fee payable pursuant to Section II.A.2. below and a combined royalty service fee in the dollar amount calculated as a percentage of Franchisee's Gross Sales for the previous month as shown below ("Royalty Service Fee"):

| Total Year-to-Date Gross Sales (defined below) Made by Franchisee <u>During current calendar year</u> | | Monthly Royalty Service Fee payable (as a percentage of <u>previous month's Gross Sales)</u> |
|---|---|---|
| $0 - $125,000 | ... | 7½% of month's Gross Sales |
| $125,001 - $250,000 | ... | 7% of month's Gross Sales |
| $250,001 - $500,000 | ... | 6½% of month's Gross Sales |
| $500,001 - $1,000,000 | ... | 6% of month's Gross Sales |
| $1,000,001 - $1,500,000 | ... | 5½% of month's Gross Sales |

3

$1,500,001 and over ... 5% of month's Gross Sales

For example purposes only and not as any indication of Gross Sales levels Franchisee should expect to achieve, should Franchisee generate Gross Sales of $350,000 during a calendar year, the monthly Royalty Service Fee payable by Franchisee during that year shall equal:

- 7½% of the previous month's Gross Sales on the first $125,000 in Gross Sales;
- 7% of the previous month's Gross Sales on the next $125,000 in Gross Sales; and
- 6½ % of the previous month's Gross Sales on the final $100,000 in Gross Sales.

Should Franchisee cross one of the Gross Sales thresholds defined above during a calendar month, the monthly Royalty Service Fee payable by Franchisee for that month shall equal the sum of the amount of Gross Sales left in the first applicable threshold multiplied by the applicable percentage PLUS the amount of Gross Sales in the next applicable threshold multiplied by the applicable percentage. In other words, Franchisee MUST pay the applicable Royalty Service Fee percentage on the full amount of each Gross Sales threshold before Franchisee can use the reduced Royalty Service Fee percentage in the next applicable threshold.

For example purposes only and not as any indication of Gross Sales levels Franchisee should expect to achieve, should Franchisee have year-to-date Gross Sales through May 31st of $100,000 and Franchisee generates $50,000 in Gross Sales for the month of June, which brings Franchisee's year-to-date Gross Sales to $150,000, the monthly Royalty Service Fee payable by Franchisee for the month of June shall equal the sum of $25,000 times 7½% plus $25,000 times 7%, or a total of $3,625.

"Gross Sales" means the total dollar volume of inspections and related services conducted in connection with the Franchised Business as described herein (including, but not limited to, wood destroying insect/organism testing and/or treatment, water testing, radon gas testing and/or mitigation, mold testing, septic tank evaluations and/or cleaning, lead paint testing, buried tank testing, preventative maintenance inspections, energy audits/inspections, safety inspections and inspection-related fee paid speaking or training engagements) booked by the Franchised Business each year and all fees and commissions received by Franchisee from third parties as a result of Franchisee's referrals of customer names and/or business to the third parties. There shall be excluded from Gross Sales taxes added to the sales price and collected from the customer. Royalty Service Fee payments received by Franchisor under this Agreement shall be under no restriction whatsoever, but shall be considered general funds of Franchisor for any and all purposes.

2. **Minimum Monthly Royalty Service Fee.** Beginning on the Minimum Effective Date, the date which is ninety (90) days following the Business Effective Date, as identified on the Data Sheet at Schedule A ("Minimum Effective Date"), and continuing for so long as this Agreement is in effect, Franchisee agrees to pay to Franchisor a minimum monthly Royalty Service Fee in the amount identified on the Data Sheet at Schedule A. If the minimum

monthly Royalty Service Fee is greater than the monthly Royalty Service Fee calculated in Section II.A.1. above, Franchisee will remit the minimum monthly Royalty Service Fee along with the required statement of Gross Sales.

...

**II(B). Reports and Records; Audit**

      1.    Franchisee shall submit to Franchisor a financial operating statement (statement of profit and loss) and balance sheet for the Franchised Business for any particularly specified monthly or quarterly period on forms specified, approved, or provided by Franchisor, and completed according to their terms.

...

      4.    Franchisor shall be entitled at any time to have Franchisee's books and records examined or audited at Franchisor's expense and Franchisee shall cooperate fully with the parties making such examination or audit on behalf of Franchisor. Franchisee shall promptly pay to Franchisor or Franchisor shall credit to Franchisee's account, as the case may be, any under or overpayment of fees revealed by the examination or audit. If an examination or audit is performed due to Franchisee's failure to submit statements of Gross Sales or to maintain books and records as prescribed herein, or in the event that the Gross Sales reported by Franchisee for any period of twelve (12) consecutive months are more than three percent (3%) below the actual Gross Sales of Franchisee for such period as determined by any such examination or audit, or in the event the examination or audit reveals one or more violations by Franchisee of the territory boundary restrictions, then Franchisee shall, within fifteen (15) days following notice, pay to Franchisor the full cost of such examination or audit as well as all additional amounts of fees and late charges shown to be due. Payment and acceptance of such amounts shall not waive or prejudice any right of Franchisor to exercise any other remedy of this Agreement, including termination in accordance with Section X. of this Agreement.

      5.    Franchisee shall submit to Franchisor such other periodic reports, forms and records as specified, and in the manner and at times specified in the Operations Manual or otherwise in writing. All reports, forms, and records submitted to Franchisor shall be true, accurate and complete.

...

**III(A). Marketing Contribution.** Franchisee shall pay monthly to Franchisor on or before the tenth (10th) day of the month for the preceding calendar month throughout the term of the franchise, along with and in addition to the Royalty Service Fee provided by Section II.A. of this Agreement, a marketing contribution in the dollar amount calculated as a percentage of Franchisee's Gross Sales (as heretofore defined) for the previous month as shown below ("Marketing Contribution"):

| Total Year-to-Date Gross Sales (defined in II.A.) Made by Franchisee During current calendar year | Monthly Marketing Contribution payable (as a percentage of previous month's Gross Sales) |
|---|---|

5

| | | |
|---|---|---|
| $0 - $125,000 | ... | 2½% of month's Gross Sales |
| $125,001 - $250,000 | ... | 2¼% of month's Gross Sales |
| Over $250,000 | ... | 2% of month's Gross Sales |

Franchisor, without seeking or obtaining agreement with Franchisee, and not as a condition to the grant or acceptance of the Franchised Business or rights hereunder, but strictly as a unilateral expression of intention and of business policy designed to enhance the competitive effectiveness and general public acceptance of the HOUSEMASTER name and Business, shall use the marketing fund ("Marketing Fund") as it shall, in its sole discretion, deem beneficial to the HOUSEMASTER Method and franchisees of Franchisor. Franchisor undertakes no obligation in using such funds to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or proportionately from the placement of advertising or promotional efforts. Franchisor does not have to spend any amount on marketing, advertising, promotion or field work in your area. Franchisor intends for the Marketing Fund to build the reputation, awareness and acceptance of the HOUSEMASTER name and Proprietary Marks and the services associated therewith and to provide marketing, advertising and promotional materials and services to benefit the franchise system. The fund can be used to formulate, develop and implement marketing, advertising and promotional efforts and campaigns, including assisting franchisees in implementing marketing, advertising, and promotional tools and programs, which may include field visits or other targeted or system-wide marketing efforts at Franchisor's discretion. The funds shall also pay reasonable costs of administration relating hereto, including administrative costs, overhead and salaries that Franchisor may incur related to the fund's purpose. Franchisor shall direct all marketing programs financed by such funds with sole discretion over the creative concepts, materials, endorsements, types of media and geographic allocation of media placement. Franchisor owes no fiduciary duty to Franchisee in connection with the use of such funds or expenditure of such funds. Franchisor has no affirmative obligation to provide any particular Franchisee with an accounting of receipts or disbursements of these funds; however, upon Franchisee's specific written request, Franchisor will provide an annual unaudited accounting of receipts and disbursements of these funds.

**HOUSEMASTER DEMANDS THAT YOU IMMEDIATELY PAY ALL PAST-DUE ROYALTY SERVICE FEES AND MARKETING CONTRIBUTIONS**

**HOUSEMASTER DEMAND THAT YOU REPORT SALES INFORMATION FOR SEPTEMBER AND OCTOBER 2015.**

**HOUSEMASTER ALSO RESERVES THE RIGHT TO EXAMINE AND AUDIT YOUR BOOKS AND RECORDS. ACCORDINGLY, PLEASE ORGANIZE YOUR BOOKS AND RECORDS SO THAT THEY ARE**

AVAILABLE FOR EXAMINATION AND AUDIT UPON HOUSEMASTER'S REQUEST.

## Violation of Franchisee Obligations

Section XII of the Franchise Agreement states, in relevant part:

V. **OBLIGATIONS OF FRANCHISEE**

In the interest of maintaining the integrity, force, quality, image and goodwill associated with the Proprietary Marks of Franchisor, Franchisee agrees to the following:

...

3. Franchisee will at all times give efficient and courteous service to the public, adhere to high standards of business ethics, integrity and fair dealing, and do nothing which would tend to discredit or in any manner damage the reputation and goodwill of Franchisor, the HOUSEMASTER Method, Franchisee, or other franchisees of Franchisor.

4. Franchisee shall make all payments and reports, and pay all debts, when due. To the extent such payments or reports are delinquent, Franchisor reserves the right to assess a Ten Dollar ($10.00) per day penalty while such payments are outstanding to compensate Franchisor for costs incurred when payments or reports are received late.

5. Franchisee shall at all times provide notice of the franchise relationship. Franchisee shall hold himself out to the public as an independent business owner operating the business pursuant to a franchise from Franchisor. Franchisee shall take such affirmative action as may be necessary to clearly disclose the franchise relationship, including, without limitation, exhibiting a notice of the fact on all signs, forms, stationery, contracts, advertising and promotional materials, and other written materials, the content of which Franchisor has the right to specify.

....

7. In connection with the Franchised Business, Franchisee agrees to not engage in any activity that may have the appearance of a conflict of interest. Franchisee warrants that it and all members of its immediate family will not directly or indirectly engage in or acquire any financial or beneficial interest in any other inspection or real estate business during the term of this Agreement without the advance written consent of Franchisor. This includes but is not limited to any business that may perform inspections and related services (such as wood destroying insect/organism testing and/or treatment, water testing, radon gas testing and/or mitigation, mold testing, septic tank evaluations and/or cleaning, lead paint testing, buried tank testing, preventative maintenance inspections, safety inspection, real estate sales or mortgage broker services, and inspection-related fee paid speaking or training engagements).

...

10. Throughout the term of this Agreement, Franchisee shall have a minimum of one (1) operational and functioning dedicated telephone line for use exclusively by the Franchised Business.

11. Franchisee shall in the operation of the Franchised Business use only stationery, advertising and promotional materials, vehicle wraps and signs, reports and forms that meet Franchisor's standards and specifications and use the Proprietary Marks and colors as prescribed from time to time by Franchisor. All materials used must disclose the franchise relationship.

**HOUSEMASTER DEMANDS THAT YOU REPORT SALES INFORMATION FOR SEPTEMBER AND OCTOBER 2015 AND MAKE FULL PAYMENT OF OUTSTANDING FEES.**

**HOUSEMASTER DEMANDS THAT YOU TAKE DOWN THE WWW.MASTERINSPECTIONSERVICES.COM WEBSITE AND CEASED TO OPERATE ANY RELATED BUSINESS AND ANY UNAPPROVED HOME INSPECTION BUSINESS OTHER THAN YOUR HOUSEMASTER™ FRANCHISE.**

## UNAUTHORIZED USE OF HOUSEMASTER METHODS AND INFORMATION

Section VII of the Franchise Agreement states, in relevant part:

A. **Confidentiality.** Franchisee hereby acknowledges that only Franchisor can franchise the proprietary rights in the HOUSEMASTER Method and all parts thereof, and of all material and information divulged to Franchisee relating to the HOUSEMASTER Method and Marketing Strategy. Franchisee further acknowledges that the HOUSEMASTER Method and Marketing Strategy, each part thereof and in its entirety, constitutes trade secrets, confidential and proprietary business information of Franchisor which are revealed to Franchisee in trust and in confidence solely for the purpose of enabling Franchisee to establish and operate the Franchised Business. Such trade secrets, confidential and proprietary business information include, but are not limited to, business procedures and processes, supplier and material lists, customer information and data, proprietary contact management software, contact or service provider information or data, training and operations manuals and materials, promotional and marketing manuals and other aids, business forms and accounting procedures, informational bulletins and software. Franchisee acknowledges that all such information, including all data contained in any database whether prepared by Franchisee or Franchisor, including, but not limited to, the contact management software system, belongs to Franchisor. Franchisee agrees that, during and after the term of this Agreement, it will not reveal or disclose any of such information to any other person or firm, except to employees of Franchisee, and then only in trust and in confidence, and only to the extent such knowledge is necessary to perform the duties of their employment. Franchisee agrees, further, that during and after the term of this Agreement it will not use any of such trade secrets or confidential business information in any manner in connection with any business or venture in which it has or may acquire any interest, direct or

8

indirect, in any capacity whatever, other than in connection with the operation of the Franchised Business.

      B.    **Use of and Improvements to the Method.** In order to assure maximum uniformity of quality and service in all inspections made by all franchised inspectors, Franchisee agrees to follow the procedures prescribed by the HOUSEMASTER Method. As Franchisor develops or learns of improvements, it will so notify franchisees and authorize their use in the Franchised Business. In return and in consideration therefore, Franchisee agrees that any idea or suggested innovation or variation which may tend to enhance or improve the HOUSEMASTER Method, including all writings and other original works of authorship regardless of form, including, but not limited to, software programs, trademarks, copyrightable works, Internet Web page or any other document or information pertaining or relating to the Franchised Business that Franchisee discovers or otherwise becomes aware of during the term of this Agreement, shall be submitted to Franchisor for its evaluation for adoption and use. Franchisee agrees that all proprietary rights to such ideas, works, innovations or variations created or acquired by Franchisee or any of its employees during the term of this Agreement shall be deemed by the parties to be works made for hire and shall belong to Franchisor and may be made available to other HOUSEMASTER franchisees. Franchisee recognizes and agrees that from time to time Franchisor may modify the HOUSEMASTER Method, including the adoption and use of new or modified trade names, trademarks, or service marks, new copyrighted materials, new computer software or new techniques. Franchisee will accept, use and offer any such changes in the HOUSEMASTER Method as if they were a part of this Agreement at the time of execution hereof and will implement such changes within a reasonable period of time. Franchisee shall make such expenditures as such changes or modifications in the HOUSEMASTER Method may reasonably require.

      Franchisee acknowledges the importance of the HOUSEMASTER Method to the reputation and integrity of the franchise system and the goodwill associated with the Proprietary Marks. If Franchisor notifies Franchisee of a failure to comply with any of the standards or procedures that are part of the HOUSEMASTER Method and Franchisee fails to correct the non-compliance within a period of time that Franchisor requires or Franchisee subsequently fails to comply with the same standard or procedure for which Franchisee received the notice, then, in addition to any other remedies to which Franchisor shall be entitled, Franchisor reserves the right to impose a fine for such non-compliance in the amount then specified in the HOUSEMASTER Manuals for the specific violation that was committed. This provision shall solely be deemed a fine and not an adequate remedy at law.

**HOUSEMASTER DEMANDS THAT YOU CEASE TO USE HOUSEMASTER'S CUSTOMER INFORMATION AND DATA, TRADE SECRETS, AND CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION IN CONNECTION WITH THE OPERATION OF YOUR COMPETING HOME INSPECTION BUSINESS.**

# Covenants Not to Compete

Section XII of the Franchise Agreement, entitled Covenants Not to Compete, states in full:

**XII. COVENANTS NOT TO COMPETE**

    A. **Definition.** Unless otherwise specified, the term "Franchisee" as used in this Section XII shall include, collectively and individually, all officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee, and of any corporation directly or indirectly controlling Franchisee, if Franchisee is a corporation; and the general partners and any limited partner (including any corporation and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of securities, or a corporation which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership.

    B. **Covenants.** The intention of the parties in the following section is to limit the Franchisee's right to compete only to the extent necessary to protect Franchisor from unfair competition. Franchisee covenants that:

        1. During the term of the Franchise Agreement, Franchisee shall not directly or indirectly divert or attempt to divert any business or customer of the Franchised Business to any competitor of Franchisee or of Franchisor;

        2. During the term of the Franchise Agreement, and for a period of eighteen (18) months following its expiration or termination for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, Franchisee shall not directly or indirectly solicit or perform services for any customer of any other HOUSEMASTER franchisee or an affiliate of Franchisor, unless said customer has not received service from a HOUSEMASTER franchisee or an affiliate of Franchisor for a period of at least twelve months;

        3. During the term of the Franchise Agreement, and for a period of eighteen (18) months following expiration or termination for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, Franchisee shall not employ or seek to employ any person employed by Franchisor or by any other HOUSEMASTER franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment;

        4. During the term of the Franchise Agreement, Franchisee shall not own, maintain, engage in, or have any interest in any business (including any business operated by Franchisee prior to entering into the Franchise Agreement) specializing, in whole or in part, in building inspection and/or related services offering or providing any services or products the same as or similar to those provided or sold through the franchise system;

        5. For a period of eighteen (18) months following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business conducted by it pursuant to this Agreement, whichever is later, and within the geographic areas specified below, Franchisee shall not, either directly or indirectly, for himself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, engage in, franchise, or have any interest in any business specializing, in whole or in part, in building inspection and/or related services offering or providing any services or selling any products the same as or similar to that provided or sold in the HOUSEMASTER franchise system (a) within a

radius of twenty-five (25) miles of the geographic area described in Section I.A.I hereunder; (b) within a radius of twenty-five (25) miles of the area granted to any other HOUSEMASTER business, which is in existence on the date of expiration or termination of this Agreement, whether franchised or owned by Franchisor or an affiliate of Franchisor; and ( c) within any geographic area designated by Franchisor as a Restricted Opportunity Territory in which HOUSEMASTER franchisees are operating as of the date of expiration or termination of this Agreement.

6. For a period of three (3) years following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business pursuant to this Agreement, whichever is later, Franchisee shall not, directly or indirectly, solicit or perform services for any customer for whom Franchisee performed services while he was a HOUSEMASTER franchisee.

7. For a period of three (3) years following expiration or termination of the Franchise Agreement for any reason, or the date on which Franchisee ceases to conduct the Franchised Business pursuant to this Agreement, whichever is later, Franchisee must cease any and all associations for business purposes with any contacts or real estate service providers that were established while a HOUSEMASTER Franchisee in connection with the Franchised Business.

8. Franchisee expressly acknowledges that he/she possesses marketable skills and abilities of a general nature outside the scope of the Business and building inspection and/or related services, and has other opportunities to exploit such skills. Consequently, enforcement of the covenants set forth above will not deprive the Franchisee of the ability to earn a living.

C. **Enforcement of Covenants.** The foregoing covenants shall be construed independently of any other covenant or provision in the Franchise Agreement. The parties hereby expressly agree that if the scope of enforceability of the provision is disputed at any time by Franchisee, a court or arbitrator, as the case may be, may modify this section to the extent that it deems necessary to make such provision enforceable under applicable law. If all or any portion of a covenant is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee shall be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated and made a part of the Franchise Agreement. In the event that Franchisee engages in the activities prohibited in this Section XII in violation of said covenant, said one (I) year period of non-competition shall extend beyond the one year anniversary date of termination or expiration of this Agreement for a period of time equal to the duration of Franchisee's violation of said covenant, but only to the extent necessary to insure that Franchisee refrains from competition for a full one (I) year period and non longer. In the event Franchisor seeks an injunction in court to enforce the covenant not to compete, the time period during which competition is restrained shall not begin to run until the earlier of: (I) the date Franchisor obtains said injunction, or (2) the date Franchisee begins to comply with the covenant not to compete.

In the event that the covenant not to compete is unenforceable in Franchisee's jurisdiction and Franchisee continues to provide building inspection services after the termination or expiration of this Agreement, Franchisee hereby agrees to assume the obligation to pay Franchisor the greater of (i) thirty percent (30%) of Gross Sales for all building inspection services conducted

for a period of one (1) year prior to the termination or expiration of this Agreement or (2) Fifty-Two Thousand five Hundred Dollars ($52,500.00) plus the cost of NIBI training (for all personnel who attended). Franchisee acknowledges that the training received in the HOUSEMASTER Method and Marketing Strategy and technical training has an inherent value for which franchisee has made no payment. The parties have agreed that franchisee shall not utilize the training received, directly or indirectly, with any other person or entity or for its own enterprise within a radius of twenty-five (25) miles of the geographic area described in Section I.A.1 without payment to Franchisor as outlined above. Further, the parties have determined that such agreement would not be prohibited or void under applicable state law because its only objective is to postpone the payment for training indefinitely, until such a time as Franchisee uses the training for other than the operation of the Franchised Business.

D. **Covenants to Be Signed by Other Employees.** Franchisor reserves the right to require Franchisee's managers, field sales personnel, inspectors and all other personnel receiving training from Franchisor to execute similar covenants in a form satisfactory to Franchisor.

E. **Modifications of Covenants.** Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant or obligation of Franchisee set forth in the Franchise Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee shall comply with any covenant as so modified, which shall be fully enforceable.

Your continued operation of a home inspection business is a direct violation of the above quoted section of the Franchise Agreement. As is made clear from the above referenced sections enforcement of this provision may require you to pay substantial amounts to protect DBR's interest.

## HOUSEMASTER DEMANDS THAT YOU CEASE OPERATION OF THE WWW.MASTERINSPECTIONSERVICES.COM WEBSITE AND ANY RELATED BUSINESS AND ANY UNAPPROVED HOME INSPECTION BUSINESS OTHER THAN YOUR HOUSEMASTER™ FRANCHISE.

## Default and Termination
Section X(A) of the Franchise Agreement provides:

A. **Termination by Franchisor for Cause.** Franchisee agrees that Franchisor may terminate this Agreement prior to the expiration of its terms if any of the following events or conditions occur by giving Franchisee written notice of termination, provided, that wherever a reason for termination is prohibited by, or a period of notice or a time allowed to cure a default as stated in this Section X is different from applicable law in effect as of the effective date of this Agreement, such reason shall be deemed deleted, and such period or time shall be deemed amended, to conform with such applicable law.

1. Franchisee fails to make any payment of money owed to Franchisor when due, or fails to submit to Franchisor when due any report required pursuant to this Agreement, and such default is not fully cured within fifteen (15) days after Franchisor gives notice of such default to Franchisee. At Franchisor's election, in lieu of or in addition to termination, Franchisor may institute arbitration or legal proceedings to recoup any outstanding money owed as provided herein at Section XIII;

6. Franchisee jeopardizes the goodwill of Franchisor's Proprietary Marks, the Franchised Business, the HOUSEMASTER Method, or the reputation of Franchisor and fails to cure fully such default within fifteen (15) days following notice to Franchisee by Franchisor;

9. Franchisee defaults in the performance of the obligations assumed under Section V of this Agreement and fails to cure fully any such default within fifteen (15) days following notice to Franchisee by Franchisor, except the obligation to maintain active errors and omissions insurance shall be subject to a seven (7) day cure period;

## This is official and formal Notice that you have breached the Franchise Agreement in the following ways and must immediately cure these defaults:

| SECTIONS IN AGREEMENTS | NATURE OF DEFAULT | HOW TO CURE |
|---|---|---|
| FA Sections II(A) and III(A) | Failure to pay royalties and marketing contributions and failure to report sales information to HouseMaster for September and October 2015. | Immediately pay to HouseMaster a sum of **$11,140.10** by wire transfer or certified check and report to HouseMaster sales for September and October 2015. |
| FA Section V and XII | Your operation of an unapproved competing home inspection business and the unauthorized use of HouseMaster's methods, trade secrets, and confidential and proprietary information. | Immediately cease operation of any competing business other than your HouseMaster™ franchise, including taking down the www.Masterinspectionservices.com website and providing to HouseMaster written assurances that you have:<br>1) Ceased to operate a home inspection business other than your HouseMaster™ franchise; and<br>2) Ceased and will continue to cease to use HouseMaster's customer information and data and its trade secrets or confidential or proprietary business information in connection with the operation of your competing home inspection business. |

You must cure these defaults by making full payment to HouseMaster of the **$11,140.10** past-due amount and by providing to HouseMaster the sales reports for September and October 2015 and a written assurance that you will immediately:

1) Cease to operate a home inspection business other than your HouseMaster™ franchise.
2) Cease to use HouseMaster's customer information or data or HouseMaster's trade secrets or confidential or proprietary business information in connection with the operation of your competing home inspection business.

The cures, payment, reports, and written assurance must be received on or before the later of:

December 18, 2015 at 5:00pm Eastern, or

5:00pm Eastern, on the 15th day after this Notice is first received as required in Section X and XIV(I) of the Franchise Agreement.

If you do not cure as required, we may terminate each of the Franchise Agreements and may require you to comply with all of your obligations upon termination including:

non-competition,
safeguarding confidential information,
ceasing operation of the franchise,
protecting and not using our service marks,
paying to us all sums due,
paying to us all damages related to the termination,
returning all manuals, information and data to us,
assigning to us all telephone/fax numbers, directory listings and internet addresses,

HouseMaster and its affiliates will not hesitate to enforce their rights by any legally and contractually available methods and processes, including litigation. HouseMaster hopes that it will be possible to

14

resolve this matter amicably and without the need to turn to more formal dispute resolution processes to enforce the Franchise Agreement that you voluntarily entered.

This notice is sent with complete reservation of all rights. Any current defaults not mentioned are not waived. All penalties or other fees and charges owed are not waived.

All comments and questions about this notice should be addressed to our franchise legal counsel:

>   Bradley D. Smith
>   FranchiseSmith Utah, LLC
>   5508 W. Kensington Cir.
>   Highland, UT 84003
>   (801) 615-1564
>   Brad@FranchiseSmith.com

# HouseMaster

422 N. 300 W.
Salt Lake City, UT 84103  accounting@sopraservices.com
Phone #  801-593-9212

**Date:** 11/11/2015

**Bill To:**
Bill Basch
3 Walton Street
Brooklyn NY 11206

| Amount Due |
|---|
| $11,140.14 |

| Date | Transaction | Amount | Balance |
|---|---|---|---|
| 07/01/2015 | INV #417-0715. Due 07/01/2015. Orig. Amount $2,937.66.<br>— HouseMaster Royalty, 25,244 @ $0.07 = 1,767.08<br>— HouseMaster A&P, 25,244 @ $0.0225 = 567.99<br>— HouseMaster Royalty, 6,026 @ $0.075 = 451.95<br>— HouseMaster A&P, 6,026 @ $0.025 = 150.64 | 2,937.66 | 2,937.66 |
| 08/01/2015 | INV #417-0815. Due 08/01/2015. Orig. Amount $1,909.20.<br>— HouseMaster Royalty, 20,640 @ $0.07 = 1,444.80<br>— HouseMaster A&P, 20,640 @ $0.0225 = 464.40 | 1,909.20 | 4,846.86 |
| 09/01/2015 | INV #417-0915. Due 09/01/2015. Orig. Amount $2,019.28.<br>— HouseMaster Royalty, 21,830 @ $0.07 = 1,528.10<br>— HouseMaster A&P, 21,830 @ $0.0225 = 491.18 | 2,019.28 | 6,866.14 |
| 10/01/2015 | INV #417-1015. Due 10/01/2015. Orig. Amount $2,137.00.<br>— HouseMaster Royalty, 1 @ $2,137.00 = 2,137.00 | 2,137.00 | 9,003.14 |
| 11/01/2015 | INV #417-1115. Due 11/01/2015. Orig. Amount $2,137.00.<br>— HouseMaster Royalty, 1 @ $2,137.00 = 2,137.00 | 2,137.00 | 11,140.14 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---|---|---|---|---|---|
| 0.00 | 2,137.00 | 2,137.00 | 2,019.28 | 4,846.86 | $11,140.14 |



# Master Inspection Services
*We're The Master in Home & Building Inspections.*

📞 **718-384-1122**
Serving Brooklyn, Queens, Staten Island and Manhattan for almost 2 decades.

HOME | HOME INSPECTION SERVICES | TESTIMONIALS | ADVANTAGES | BLOG | CONTACT US



## Praises For Master Inspection Services

Master Inspection Services is proud of its repeat customers and many referrals. Here are a few of our testimonials.



### Satisfied Home Inspection Clients

Master Inspection Services did a great job, being a first time home buyer I learned a lot about the house during the inspection. What I feel Master Inspection Services does particularly well was to point out the finding during the inspection.

WendyAnn Thelmon
Brooklyn, NY

---

Mr. William Butch was pleasant and extremely knowledgeable. Customer service and knowledge of the field was amazing. He gave me a lot of great advice to take care and maintain my first home. I would definitely recommend him. Great guy.

Besim Mehmedovic
Staten Island, NY

---

Our house inspector was very professional and thorough. He explained every step of the way. He inspected every possible area of the house and gave a prompt and detailed report. Any and all questions were answered. Very nice and respectful of all parties involved. What I feel Master Inspection Services does particularly

I give Master Inspection Services a high score because I like how thorough you are when inspecting a home for my clients. They feel very comfortable when leaving the house knowing everything about their new home they are about to purchase.

Phyllis Cangro Real Estate Agent Gillani Homes Realty
90 Sand Lane
Staten Island, New York 10305 Office(718) 442-4400Cell(347) 512-6689
e-mail. bksirealestate@gmail.com

The inspector was punctual, affable and thorough. He made the purchaser feel better about his decision and he returned the results of the inspection in a matter of hours.

---

**One year home inspection repair guarantee
718-384-1122**

Residential and commercial properties

## Give Us Your Opinion On Your Home Inspection Experience



Name

Email

Property Inspected

Feedback

* Required